THE HONORABLE TANA LIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SUBSPACE OMEGA, LLC,

               Plaintiff,

    v.

AMAZON WEB SERVICES, INC.,

               Defendant.

No. 2:23-cv-01772-TL

DEFENDANT AMAZON WEB SERVICES, INC.'S MOTION TO DISMISS UNDER RULE 12(B)(6)

NOTE ON MOTION CALENDAR: JULY 10, 2024

ORAL ARGUMENT REQUESTED

MOTION TO DISMISS
(NO. 2:23-CV-01772-TL)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 3

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT ................................................................................................................... 6

I.   Subspace's federal antitrust claims (Counts I, II) fail to plausibly allege the required
     elements. ................................................................................................................ 7

     A.   Subspace fails to allege exclusionary conduct. ............................................ 7

          1.   Subspace does not allege that AWS refused to deal. ......................... 8

          2.   Subspace does not allege AWS terminated a prior course of dealing. ..................... 9

          3.   Subspace does not allege that AWS sacrificed short-term profits. ....................... 10

          4.   Subspace does not allege that AWS refused to provide it services that are sold to
               similarly situated customers ............................................................. 10

     B.   Subspace fails to allege antitrust injury. ....................................................... 11

     C.   Subspace fails to allege monopoly power in a plausible relevant market ..................... 12

     D.   Subspace fails to allege a direct, substantial, and reasonably foreseeable effect on U.S.
          commerce. ............................................................................................... 14

II.  Subspace's miscellaneous claims also fail ......................................................... 17

     A.   State antitrust claims (Counts III, IV, VII) fail for the same reasons as the federal claims.
          ................................................................................................................ 18

     B.   Tortious interference claim (Count V) fails for lack of a wrongful act. ....................... 18

     C.   Communications Act claim (Count VI) fails because Subspace ignores existing law and
          relies on a proposal that would change the law only prospectively. ............................ 18

CONCLUSION ................................................................................................................ 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ................................................................. 8–9

*Aerotec, Int'l, Inc. v. Honeywell Int'l, Inc.*,
  4 F. Supp. 3d 1123 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ............................ 8

*Apple, Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................................. 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................. 6, 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................. 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................. 11

*Christy Sports, LLC v. Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009) ................................................................. 10

*Coronavirus Rptr. v. Apple, Inc.*,
  85 F. 4th 948 (9th Cir. 2023) ................................................................. 12–13

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) ................................................................. 15

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .............................................................*passim*

*Green Country Food Mkt., Inc. v. Bottling Grp.*,
  371 F.3d 1275 (10th Cir. 2004) ................................................................. 13

*Hicks v. PGA Tour*,
  897 F.3d 1109 (9th Cir. 2018) ................................................................. 2, 13–14

*Hogan v. Amazon.com, Inc.*,
  No. 2:21-cv-00996-JHC, 2024 WL 1091671 (W.D. Wash. Mar. 13, 2024) ................................ 13

MOTION TO DISMISS – ii
(NO. 2:23-CV-01772-TL)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*,
   146 F. Supp. 3d 1217 (S.D. Cal. 2015) ..................................................................... 9–10

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   452 F. Supp. 2d 555 (D. Del. 2006) .................................................................................. 17

*It's My Party, Inc. v. Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016) .............................................................................................. 14

*Kaplan v. Burroughs Corp.*,
   611 F.2d 286 (9th Cir. 1979) .............................................................................................. 11

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................................................. 6

*Les Shockley Racing, Inc. v. Natl. Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989) ...................................................................................... 2, 11

*McGlinchy v. Shell Chemical Co.*,
   845 F.2d 802 (9th Cir. 1988) ..................................................................................... *passim*

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ................................................................................... *passim*

*PBTM LLC v. Football Nw., LLC*,
   511 F. Supp. 3d 1158 (W.D. Wash. 2021) ..................................................................... 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ......................................................................................... 13–14

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) .......................................................................... 13

*Rutman Wine Co. v. E. & J. Gallo Winery*,
   829 F.2d 729 (9th Cir. 1987) .............................................................................................. 12

*Segal v. Amazon.com*,
   280 F. Supp. 2d 1229 (W.D. Wash. 2003) .................................................................... 18

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) .............................................................................................................. 7

*Tanaka v. USC*,
   252 F.3d 1059 (9th Cir. 2001) ............................................................................................ 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*United States v. LSL Biotechnologies*,
    379 F.3d 672 (9th Cir. 2004) ................................................................... 16–17

*Verizon Commc'ns Inc. v. L. Off. of C.V. Trinko, LLP*,
    540 U.S. 398 (2004) ...................................................................................... *passim*

**State Cases**

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
    105 Wash. 2d 778 (1986) ............................................................................ 18

*Keodalah v. Allstate Ins. Co.*,
    194 Wash. 2d 339 (2019) ............................................................................ 18

*Moore v. Com. Aircraft Interiors, LLC*,
    168 Wash. App. 502 (2012) ........................................................................ 18

**Federal Statutes**

5 U.S.C. § 553(d) ............................................................................................... 19

15 U.S.C. §§ 1-38 ........................................................................................ *passim*

15 U.S.C. § 6a ...................................................................................... 1, 6, 15

47 U.S.C. § 151 *et seq.* ............................................................................. *passim*

**State Statutes**

Wash. Rev. Code § 19.86 ................................................................................ 6, 18

**Other Authorities**

47 C.F.R. § 1.427 .............................................................................................. 19

*Notice of Proposed Rulemaking*, WC Docket No. 23-320, FCC 23-83 ................................... 19

83 Fed. Reg. 7852 .............................................................................................. 19

Fed. R. Civ. P. 12(b)(6) ............................................................................... 1, 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Amazon Web Services, Inc. (AWS) moves to dismiss Plaintiff Subspace omega, LLC (Subspace)'s Complaint for failure to state a claim upon which relief can be granted.

## INTRODUCTION

This case arises from Subspace's demand that AWS, a cloud services provider, supply Subspace with unlimited free network connections anywhere in the world based on AWS having previously connected Subspace to its network for free in the Middle East. AWS offered to connect to Subspace's network on standard terms, never refused to connect with Subspace's network, and never terminated Subspace's existing connection. Subspace nonetheless filed this lawsuit alleging monopolization and attempted monopolization in violation of the U.S. antitrust laws because AWS did not accede to Subspace's demands for unlimited free connections. Subspace has not plausibly alleged any of the requirements of these claims, much less all of them, and its miscellaneous other claims fare no better.

Both monopolization and attempted monopolization claims require plausible allegations that (1) the defendant has monopoly power in a properly defined market (or, in the case of attempt, a dangerous probability of achieving monopoly power with the specific intent to monopolize); (2) the defendant engaged in exclusionary conduct; and (3) the plaintiff has suffered an antitrust injury, meaning an injury to the plaintiff that results from a reduction in competition in the market as a whole as opposed to merely harm to the plaintiff's individual business. Further, the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a, requires the plaintiff to show that the exclusionary conduct had a direct, substantial, and reasonably foreseeable effect on competition *in the United States*. Subspace's antitrust claims fail for multiple reasons.

*First*, the Complaint fails to allege exclusionary conduct. Subspace tries to style its claim as a refusal to deal, but the antitrust laws do not restrict the right of a firm to decide with whom it will deal and on what terms. This is because compelling firms to deal with one another conflicts

MOTION TO DISMISS – 1
(NO. 2:23-CV-01772-TL)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

with the "underlying purpose of antitrust law" and requires courts to act as central planners. *Verizon Commc'ns Inc. v. L. Off. of C.V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004). The only exception to this rule requires a plaintiff to show, among other things, that the plaintiff and defendant were engaged in a prior profitable course of dealing that the defendant then halted, refusing to continue dealing with the plaintiff. Here, Subspace alleges no prior profitable course of dealing in the United States, and does not allege any refusal by AWS to deal with Subspace anywhere in the world. Instead, Subspace says AWS did not give it *unlimited free connections* to AWS's network everywhere in the world the way Subspace wanted but, as a matter of law, that is not exclusionary conduct that can support an antitrust claim.

*Second*, the Complaint does not allege antitrust injury—that is, injury to competition in the market as a whole. Antitrust injury is a critical element of an antitrust claim because the antitrust laws protect competition, not competitors. The Ninth Circuit has explained that removal of one competitor from a market does not establish antitrust injury because it does not establish a reduction in market-wide competition rather than mere injury to a single business. *See, e.g.*, *Les Shockley Racing, Inc. v. Natl. Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). Here, the Complaint concedes that Subspace—a company that offered to improve the speed of network connections—was one of many competitors offering that service and had essentially only one large customer. Subspace's allegation that it was harmed because AWS did not provide it with unlimited free connections is not an allegation of injury to overall competition. That is fatal to Subspace's antitrust claims.

*Third*, the Complaint fails to allege that AWS has monopoly power in a properly defined relevant market, which requires dismissal. Subspace alleges purported markets limited to AWS: (1) "direct peering access to AWS's network" and (2) "game cloud computing optimization services within the AWS network." These types of "single brand" markets that ignore AWS's competitors are heavily disfavored because they fail to include economic substitutes, *see Hicks v. PGA Tour*, 897 F.3d 1109, 1120–23 (9th Cir. 2018), and the Complaint contains no factual

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  allegations supporting such conclusory and narrowly defined markets. To the contrary, the

2  Complaint concedes that there are many networks that compete with AWS, multiple ways to

3  connect to AWS, and various uses for network optimization services. Compl. ¶¶ 88, 136, ECF

4  No. 1. Subspace's self-serving market definitions ignore all of these facts and should be rejected.

5       *Fourth*, the Complaint does not allege injury to competition in the United States.

6  Subspace alleges that (1) AWS provided it with free connections in the Middle East and later

7  refused to provide unlimited free connections in Germany and elsewhere, and (2) somehow this

8  caused Subspace to be unable to provide services to Epic, its one large customer in the Middle

9  East, resulting in termination of that contract. *Id.* ¶¶ 5, 191. But the U.S. antitrust laws exist to

10  protect U.S. competition and require that challenged conduct had a direct, substantial, and

11  reasonably foreseeable effect of harming competition in the United States. The Ninth Circuit has

12  made clear that commercial activities taking place abroad are outside the reach of the U.S.

13  antitrust laws unless they directly affect U.S. competition. *See, e.g.*, *McGlinchy v. Shell Chem.*

14  *Co.*, 845 F.2d 802, 815 (9th Cir. 1988). Subspace's argument that AWS caused it to default on

15  providing services abroad does not allege a direct, substantial, and reasonably foreseeable effect

16  on U.S. competition.

17       *Finally*, the Complaint asserts various fallback claims that also fail. Subspace's state

18  antitrust and tort claims fail along with the deficient federal antitrust claims. Its purported

19  Communications Act claim fails because the claim ignores existing law and seeks to apply a

20  *proposed* regulation that is not yet in force and, even if adopted in the future, would not apply

21  retroactively.

22       The Complaint should be dismissed in its entirety.

23                                  **BACKGROUND**

24       AWS is a cloud services provider. Compl. ¶ 14.[1] Cloud computing is the on-demand

25  delivery of information technology services, such as computer processing and data storage, over

26

---

[1] For purposes of this brief, AWS describes the facts alleged in Subspace's complaint. AWS makes no concession as to the accuracy of Subspace's assertions.

MOTION TO DISMISS – 3
(NO. 2:23-CV-01772-TL)

a network. Many entities, including Internet service providers, private businesses, and governments run their own computer networks. Computer networks connect to other networks, allowing communications across networks, and the global interconnected web of networks is called the Internet. *Id.* ¶ 16. To provide cloud computing services, AWS operates a computer network and infrastructure (including datacenters that house computer servers) that connects it to other networks. *Id.* ¶¶ 2, 63.

Two networks can connect in different ways and on different terms. *Id.* ¶¶ 18–20. Where two networks have similar profiles and exchange roughly comparable volumes of information, they might connect using "free peering," essentially trading access instead of exchanging payment. *Id.* ¶ 37. In contrast, where the volume of information exchanged between the two networks will not be balanced, one network often makes a payment to the other. *Id.* ¶¶ 18, 39, 66.

Epic Games is a customer of AWS's cloud computing services. *Id.* ¶¶ 58, 62. Epic has used AWS since at least 2018 to support Epic's popular online video game, Fortnite. *Id.* ¶ 58. Players can access Fortnite over the Internet, and information is sent back and forth between the players and the AWS servers. *Id.* ¶ 83.

In 2019, Epic hired Subspace to provide "network optimization" services in the Middle East to speed up connections and improve the Fortnite gaming experience for players in the Middle East because at that time AWS's network in the region was slower than Epic desired. *Id.* ¶¶ 3, 59, 99.[2] In some circumstances, network optimization services can help improve network connections by connecting two networks more directly, reducing "latency," which is how long data takes to get from point A on one network to point B on a different network. *Id.* ¶¶ 22, 27–31, 36. Apart from Subspace, there are many competing providers of network optimization

---

[2] Plaintiff here is Subspace omega, LLC, which allegedly acquired the claims of Subspace, Inc. Compl. ¶ 15. For convenience, this motion refers to both entities as "Subspace," but AWS reserves all rights to challenge the standing of Plaintiff to assert claims on behalf of Subspace, Inc.

MOTION TO DISMISS – 4
(NO. 2:23-CV-01772-TL)

1   services, including Google, Microsoft, Digital Ocean, Alibaba, AWS, and "various [other]

2   entities." *Id.* ¶¶ 88, 136.

3       After Epic hired Subspace in 2019, Subspace and AWS established free peering

4   connections between Subspace's network and AWS's datacenters in the United Arab Emirates,

5   Bahrain, and India. *Id.* ¶¶ 99–100. This allowed Subspace to serve their mutual customer, Epic,

6   in the Middle East. *Id.*

7       Subsequently, Subspace demanded AWS provide free network connections in other

8   countries. In January 2020, Subspace asked AWS to provide a free network connection in

9   Frankfurt, Germany. *Id.* ¶ 102. In response, AWS offered to connect with Subspace using its

10  publicly available Direct Connect (DX) service at standard pricing. *Id.* ¶¶ 104, 107–09. DX is

11  another way for networks to connect with "the entire Amazon network." *Id.* ¶¶ 66, 72. Subspace

12  agreed and "worked with AWS to set up connections through AWS Direct Connect." *Id.*

13  ¶¶ 108–09, 118. Subspace used DX to connect to AWS's network for more than one year. *Id.*

14  ¶ 118.

15      In November 2021, Subspace asked AWS to provide free network connections at

16  locations in "Asia and Australia, India, Europe and Africa, and North America," including six

17  U.S. locations. *Id.* ¶¶ 120, 123–24. AWS again offered to connect: AWS offered to set up free

18  peering connections, but explained that Subspace would need to pay for connection through

19  DX—as thousands of other customers do—if traffic exceeded a certain threshold. *Id.* ¶ 126. This

20  time, Subspace rejected the offer and refused to connect other than via free peering. *Id.* ¶ 127.

21      After choosing to reject AWS's offer, Subspace alleges that it was "unable to perform

22  under its contract with Epic" to provide network optimization in the Middle East. *Id.* ¶¶ 5, 191.

23  Subspace further alleges that Subspace terminated its contract with Epic in February 2022 and

24  went out of business in May 2022. *Id.* ¶¶ 56, 148–49.

25      A year and a half later, Subspace filed this Complaint containing seven overlapping

26  counts: (1) monopolization under the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization

MOTION TO DISMISS – 5
(NO. 2:23-CV-01772-TL)

under the Sherman Act, 15 U.S.C. § 2; (3) monopolization under the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.040; (4) attempted monopolization under the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.040; (5) tortious interference with contractual relations; (6) a violation of the Communications Act of 1934, 47 U.S.C. § 201(b); and (7) unfair competition in violation of Wash. Rev. Code § 19.86.020.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That requires more than "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Supreme Court has directed lower courts to screen antitrust claims carefully at the pleading stage because unmeritorious claims "chill the very conduct the antitrust laws are designed to protect," *Trinko*, 540 U.S. at 414, and impose enormous burden on parties and on the courts. *Twombly*, 550 U.S. at 558–59; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046–47 (9th Cir. 2008) (concluding rigorous application of these standards is particularly important in the antitrust context "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case").

## ARGUMENT

Subspace's Complaint fails to state a claim for multiple independent reasons. Among other fatal flaws, Subspace: (a) fails to allege exclusionary conduct; (b) fails to allege harm to competition as a whole as opposed to just harm to an individual business; (c) fails to allege monopoly power in a properly defined relevant market; (d) challenges conduct outside the United States but fails to allege a direct, substantial, and reasonably foreseeable effect on U.S. commerce as required under the FTAIA, 15 U.S.C. § 6a; (e) fails to allege essential elements of

MOTION TO DISMISS – 6
(NO. 2:23-CV-01772-TL)

its state antitrust and tort claims; and (f) relies on a proposed rule that does not apply retroactively for its Communications Act claim.

## I.   Subspace's federal antitrust claims (Counts I, II) fail to plausibly allege the required elements.

### A.   Subspace fails to allege exclusionary conduct.

Subspace's antitrust claims should be dismissed because Subspace fails to allege exclusionary conduct. Antitrust law "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). Accordingly, to state a claim for either monopolization or attempted monopolization, a plaintiff must allege exclusionary conduct. *Id.* at 455–56; *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004).

Here, Subspace asserts that AWS engaged in an exclusionary "refusal to deal." Generally, federal antitrust law "does not restrict the long recognized right of a [company] . . . freely to exercise [its] own independent discretion as to parties with whom [it] will deal." *Trinko*, 540 U.S. at 408. Companies negotiate with one another every day. If not receiving the terms you want in a business deal were an antitrust violation, courts would be flooded with contrived antitrust claims. The law thus requires much more to state a claim. In fact, to avoid chilling the competition that the antitrust laws were designed to protect, the Supreme Court has identified only one narrow instance in which refusing to deal with another company can constitute exclusionary conduct in violation of the antitrust laws, and the Court has further cautioned that this exception lies "at or near the outer boundary of § 2 liability." *Id.* at 409.

Specifically, to fall within this exception, a plaintiff must allege that: (1) the defendant refused to deal with the plaintiff at all; (2) in doing so, the defendant terminated a prior course of dealing; (3) the prior course of dealing was profitable for the defendant, such that the defendant is now sacrificing profits to exclude the plaintiff; and (4) the defendant refused to sell products that it already sold to similarly situated customers. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993–95 (9th Cir. 2020). Moreover, because refusal to deal claims are disfavored, these requirements

MOTION TO DISMISS – 7
(NO. 2:23-CV-01772-TL)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

must be interpreted strictly, and in practice the Ninth Circuit has repeatedly rejected purported

refusal to deal claims. *See, e.g.*, *id.* at 995 (reversing district court's holding that defendant had a

duty to deal because "none of the required elements [were] present, let alone all of them");

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183–84 (9th Cir. 2016) (rejecting

attempt to "shoehorn" alleged conduct into "narrow exception" to the rule that there is no duty to

deal and reiterating that "[c]ompetitors are not required to engage in a lovefest" and "even an act

of pure malice by one business competitor against another does not, without more, state a claim

under the federal antitrust laws"); *MetroNet*, 383 F.3d at 1131–34 (rejecting refusal to deal claim

that did not "fall within the [] exception to the general 'no duty to deal' rule").

Subspace's federal antitrust claims are no exception: Subspace has alleged none of the

elements required for an exclusionary refusal to deal.

### 1. Subspace does not allege that AWS refused to deal.

Most fundamentally, Subspace does not allege that AWS refused to deal with it. In fact,

the Complaint is full of admissions that AWS offered to connect to Subspace. *See, e.g.*, Compl.

¶¶ 108–09, 126. Instead, Subspace complains that AWS refused to agree to the exact terms

Subspace wanted: unlimited free connections in multiple locations around the world. But even if

the defendant offers only "disadvantageous or onerous terms," there is no refusal to deal claim.

*Aerotec, Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1138 (D. Ariz. 2014), *aff'd*, 836

F.3d 1171 (9th Cir. 2016); *see also Trinko*, 540 U.S. at 408–10 (holding that a defendant's

"alleged insufficient assistance in the provision of [interconnection] services to rivals is not a

recognized antitrust claim").

In *Aerotec*, the plaintiff purchased parts from Honeywell, a competitor for repairing

Honeywell engines. 4 F. Supp. 3d at 1129–30. Aerotec alleged that Honeywell charged Aerotec

higher prices than it charged non-rivals, had an onerous ordering system, and delayed shipments.

*Id.* at 1137. The Ninth Circuit affirmed the district court's decision dismissing the complaint,

explaining "Aerotec simply did not like the business terms offered by Honeywell." *Aerotec*, 836

1    F.3d at 1184. That is precisely what Subspace has alleged here: it admits that AWS offered

2    network connections and quibbles that it preferred different terms. Under well-established law,

3    that is not a refusal to deal, and that alone is fatal to Subspace's antitrust claims.

4    **2.    Subspace does not allege AWS terminated a prior course of dealing.**

5    Subspace also fails to allege exclusionary conduct because it has not alleged the

6    termination of a prior course of dealing. The Complaint alleges that AWS engaged in free

7    peering with Subspace in the Middle East. Compl. ¶¶ 99–100. But the Complaint *does not allege*

8    *that AWS ever terminated that arrangement*. Instead, it alleges that AWS "*attempted* to force

9    Subspace to terminate already-established private peering sessions at certain Middle East and

10   India locations altogether, replacing them with Direct Connect connections if traffic exceeded a

11   certain threshold and with public peering if traffic fell below that threshold." *Id.* ¶ 126 (emphasis

12   added). An alleged "attempt" to cause Subspace to pay for connections if "traffic exceeded a

13   certain threshold" is not a threat to terminate a connection, much less an actual termination.

14   AWS never terminated its peering arrangement with Subspace in the Middle East, and Subspace

15   does not allege otherwise.

16   Nor can Subspace claim that AWS somehow "terminated" a course of dealing outside the

17   Middle East. That would not be possible, because the parties' free peering connections were

18   always limited to the Middle East. Courts flatly reject purported refusal to deal claims where the

19   defendant declines to *expand* prior dealing. For example, in *Qualcomm*, the Ninth Circuit held

20   that Qualcomm's practice of granting non-exhaustive licenses to certain chip manufacturers did

21   not create a duty to grant exhaustive licenses. 969 F.3d at 994. Similarly, in *Imperial Irrigation*

22   *District v. California Independent System Operator Corporation*, the court rejected a refusal to

23   deal claim where the defendant power company "announced plans to *prospectively increase*" the

24   amount of power the plaintiff could receive but ultimately allowed the plaintiff to receive only

25   the amount of power it had received in the past, explaining the defendant was "simply

26   maintain[ing] their course of dealing at the status quo." 146 F. Supp. 3d 1217, 1234–35 (S.D.

MOTION TO DISMISS – 9
(NO. 2:23-CV-01772-TL)

Cal. 2015) (emphasis in original). Subspace has not alleged the termination of a prior course of dealing, and this is fatal to its antitrust claims.

### 3. Subspace does not allege that AWS sacrificed short-term profits.

Subspace also fails to meet the narrow exception under which a refusal to deal might be actionable because it does not allege that the "only conceivable rationale" for AWS's actions was to sacrifice short-term profits. *Qualcomm*, 969 F.3d at 993. In fact, Subspace has affirmatively alleged the opposite: it says that AWS declined to provide unlimited free peering, and instead offered connection through DX—a paid service—if traffic exceeded certain volumes. Shifting from a free connection to a paid connection would be *more* profitable to AWS and is the precise opposite of a profit sacrifice. That fatal defect alone requires dismissal. As the Ninth Circuit has explained, where the defendant has chosen the "more lucrative" path, a refusal to deal claim fails. *Id.* at 994; *see also MetroNet*, 383 F.3d at 1132–34 (rejecting refusal to deal where termination was intended to increase short-term profits); *accord Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009) (rejecting refusal to deal where defendant "expects to increase (not forsake) short-term profits by operating its own ski rental facility").

### 4. Subspace does not allege that AWS refused to provide it services that are sold to similarly situated customers.

Subspace has not and cannot allege that AWS refused to provide it with products that AWS sold in the "existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 994. To the contrary, the Complaint acknowledges that AWS offered to connect to Subspace using either (1) DX, a service that AWS makes generally available to the marketplace and is used by thousands of customers; or (2) peering, depending on the volume of data Subspace would be transferring. Subspace mentions that AWS engages in free peering with some networks, *see* Compl. ¶ 140, but admits that these are *exceptions* to the general approach of using free peering "where a network provider and the requesting party have similar profiles and information exchanged between them is balanced." *Id.* ¶ 37. Subspace admits, as it must, that

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

connections are usually paid where the information exchanged is not balanced, *id.* ¶ 39, and offers no plausible allegations that it had a "similar profile" to AWS or that the information exchanged between them was balanced.

Because Subspace fails to allege any of the required elements of an actionable refusal to deal, its antitrust claims must be dismissed for lack of exclusionary conduct.

## B.    Subspace fails to allege antitrust injury.

The Complaint separately fails to state an antitrust claim because Subspace has not alleged antitrust injury—that is, harm to competition. The Supreme Court and the Ninth Circuit have repeatedly emphasized that an antitrust plaintiff *must allege harm to competition in the market as a whole*, not just harm to an individual competitor. *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws [] were enacted for the protection of competition, not competitors.") (internal quotation marks omitted); *Les Shockley*, 884 F.2d at 508 (affirming dismissal of complaint because "removal of one or a few competitors need not equate with injury to competition," and so plaintiff must "plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market").

A plaintiff cannot satisfy this requirement by merely alleging injury to its own business because "[t]he elimination of a single competitor, without more, does not prove anticompetitive effect." *McGlinchy*, 845 F.2d at 812. This requirement is critical to distinguishing a viable antitrust claim from an ordinary business dispute that should be dismissed at the pleading stage. *See Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) ("[I]mpact upon competition in a relevant market is an absolutely essential element [that] . . . distinguishes the antitrust violation from the ordinary business tort.").

Thus, a plaintiff must, at a minimum, plausibly allege "actual detrimental effects on competition" market-wide, such as "reduced output, increased prices, or decreased quality" *as a result of damage to the competitive process*. *Qualcomm*, 969 F.3d at 989. Simply alleging

1  changes in output, prices, or quality is insufficient, as those changes could be "fully consistent

2  with a free, competitive market." *Id.* at 990.

3  Subspace does not meet this test. The Complaint alleges no facts plausibly supporting

4  harm to overall competition. At most, Subspace alleges only harm to itself—that because it did

5  not receive unlimited free connections to AWS, it provided inferior services. Compl. ¶ 145. But

6  there are no allegations that this led to higher market-wide prices or lower output in the market

7  as a whole. *See, e.g.*, *Qualcomm*, 969 F.3d at 989. Subspace concedes that it is only one of many

8  "entities that offer network optimization services" to customers, including to customers who use

9  the AWS Network. Compl. ¶ 88. There is no basis in the Complaint to conclude that how AWS

10 connected with Subspace affected the quality of Google, Microsoft, Digital Ocean, Alibaba,

11 Tencent, and "various" others "*that competed with Subspace's services*," much less of the market

12 as a whole. *Id.* ¶¶ 88, 136 (emphasis added). In addition, Subspace indicates that it had only one

13 large customer, Epic. *Id.* ¶¶ 7, 149. These alleged facts show that Subspace was just one player

14 out of many, not the driver of market-wide pricing.

15 Subspace's failure to allege harm to overall competition underscores that it does not have

16 a viable antitrust case. *See, e.g.*, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729,

17 734–35 (9th Cir. 1987) (affirming dismissal because although plaintiff "clearly pleads injury to

18 itself, its conclusion that competition has been harmed thereby does not follow").

19 **C.   Subspace fails to allege monopoly power in a plausible relevant market.**

20 Subspace's antitrust claims also fail because it does not plausibly allege that AWS has

21 either monopoly power or a dangerous probability of achieving monopoly power in a properly

22 defined relevant market. A properly defined relevant market is critical in monopolization and

23 attempted monopolization cases. *See MetroNet*, 383 F.3d at 1130. A relevant market defines "the

24 field in which meaningful competition is said to exist" and thus must include all reasonably

25 interchangeable substitutes for the same use. *Coronavirus Rptr. v. Apple, Inc.*, 85 F. 4th 948,

26

MOTION TO DISMISS – 12
(NO. 2:23-CV-01772-TL)

954–55 (9th Cir. 2023); *see also Hicks*, 897 F.3d at 1120–23 (affirming dismissal for failure to plead a plausible market that included "all economic substitutes").

Here, Subspace alleges two markets limited solely to AWS's own network, Compl. ¶¶ 82–89, but courts regularly reject attempts to restrict markets to a single product or brand where there are other alternatives available. *See, e.g.*, *Tanaka v. USC*, 252 F.3d 1059, 1063 (9th Cir. 2001) (affirming dismissal based on alleged market of "UCLA women's soccer program" because soccer players could choose other schools); *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("In general, a manufacturer's own products do not themselves comprise a relevant product market[, and a] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437–38 (3d Cir. 1997) (affirming dismissal based on alleged market limited to ingredients used by Domino's Pizza because it did not include "all reasonably interchangeable products"); *Hogan v. Amazon.com, Inc.*, No. 2:21-cv-00996-JHC, 2024 WL 1091671, at *6 (W.D. Wash. Mar. 13, 2024) (dismissing complaint where plaintiff did "not meet the high burden to allege a plausible single product market" because they failed to allege a "product [that] is 'so unique' that there is no other product that competes with it"); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1108 (N.D. Cal. 2022) ("Plaintiff does not cite a single antitrust case that has *ever* recognized a *single-brand primary market*.") (emphasis in original); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (dismissing complaint for failure to plausibly allege facts to support "counterintuitive claim that Apple's operating system is so unique that it suffers *no* actual or potential competitors").

As to the purported market for "the provision of network optimization services for gaming applications on the AWS network," Compl. ¶ 86, the Complaint offers no allegations at all as to why the market is limited to just AWS and to just gaming. Quite the opposite, the Complaint actually alleges that there are many networks competing with AWS, *id.* ¶ 65, and many uses for network optimization beyond gaming. *Id.* ¶¶ 25–26, 46–48 (alleging that

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  customers use network optimization services for at least "audio and video streaming, eSports,

2  Voice over Internet Protocol ('VoIP'), video conferencing, and certain banking and financial

3  services"). This purported market fails by "omit[ting] many economic substitutes." *Hicks*, 897

4  F.3d at 1121.

5       As to the purported market for "[free] peering to the AWS Network," Subspace asserts

6  that this market is limited to AWS "*[b]ecause Epic Games contracted with Amazon to use*

7  *AWS's Network* to host Epic Games' gaming applications." Compl. ¶ 82 (emphasis added). But a

8  contract between two parties is not how antitrust markets are defined as a matter of law: "no

9  court has defined a relevant product market with reference to the particular contractual restraints

10  of the plaintiff." *Queen City Pizza, Inc.*, 124 F.3d at 438. Again, the Complaint's allegations

11  undermine this market definition by admitting that many networks compete with AWS. Compl.

12  ¶ 65. The Complaint also offers no plausible allegations supporting the exclusion of all paid

13  methods to connect to AWS such as DX when those methods are clearly alternatives that

14  thousands of AWS customers use every day. At the pleading stage, courts should apply "judicial

15  experience and common sense" to reject alleged markets that are "artificial" and "contorted to

16  meet [plaintiffs'] litigation needs." *Hicks*, 897 F.3d at 1121 (quoting *Iqbal*, 556 U.S. at 679); *see*

17  *also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("But that court

18  was not required to accept uncritically two market definitions . . . that coincidentally fit

19  plaintiff's precise circumstances. No party can expect to gerrymander its way to an antitrust

20  victory without due regard for market realities.").

21       Subspace's attempt to manufacture markets limited to a single brand and single use case

22  fails, and the Court should reject these markets consistent with the common practice of the Ninth

23  Circuit and other courts rejecting single brand markets.

24      **D.  Subspace fails to allege a direct, substantial, and reasonably foreseeable effect on
       U.S. commerce.**

25       Subspace's antitrust claims also fail because they are based on foreign conduct that does

26  not have the effect on U.S. commerce required to support a U.S. antitrust claim. The U.S.

MOTION TO DISMISS – 14
(NO. 2:23-CV-01772-TL)

antitrust laws exist to protect competition *in the United States*; they do not exist to open the U.S. courts to grievances about business disputes anywhere in the world. The Foreign Trade Antitrust Improvements Act (FTAIA) specifically bars antitrust claims based on foreign conduct unless there is a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce. 15 U.S.C. § 6a; *see also F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161–62 (2004). In this respect it is not enough that AWS and Subspace are U.S. companies. *See, e.g., McGlinchy*, 845 F.2d at 814 (applying FTAIA to U.S.-based companies operating abroad). Subspace's allegations here do not meet the FTAIA test.

This case is based on a commercial relationship that existed in the Middle East. Subspace's core allegations are that:

- Subspace provided Epic with network optimization services in the Middle East. Compl. ¶¶ 3, 99. Subspace does not allege it served Epic anywhere else.

- In July 2019, AWS and Subspace set up free peering in the Middle East to serve Epic in the region. *Id.* ¶¶ 98–100.

- In January 2020, Subspace "asked AWS for additional peering in Frankfurt, Germany" and in March 2020 AWS offered to connect using DX. *Id.* ¶¶ 102–04. Subspace agreed and used DX for over a year. *Id.* ¶¶ 107–18.

- In November 2021, AWS "attempted" to limit free peering with Subspace in the Middle East and shift to paid connection through DX if traffic "exceeded a certain threshold." *Id.* ¶ 126.

- Also in November 2021, Subspace requested peering at additional locations in Asia, Australia, Europe, Africa, and North America, including six U.S. locations. *Id.* ¶¶ 120, 123–24. AWS agreed to provide free peering for lower volumes of data but said Subspace should shift to DX if traffic exceeded a certain threshold. *Id.* ¶ 126.

- In February 2022, Subspace terminated its contract with Epic. *Id.* ¶ 148.

- In May 2022, Subspace went out of business. *Id.* ¶¶ 56, 149.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    The only allegation related to the United States is that in November 2021, Subspace

2    requested free peering at six U.S. locations as part of a broader global request. *Id.* ¶¶ 123–24. In

3    response, AWS agreed to connect either for free or for a fee using DX, depending on the volume

4    of data. *Id.* ¶ 126.

5    There are no other allegations specific to the United States. Again, Subspace does not

6    allege that it ever connected to AWS in the United States or ever served Epic or any other

7    customer in the United States. The paucity of specific allegations about the United States—just

8    two paragraphs out of 217, referencing a few U.S. locations as part of a broader global peering

9    request—confirms that this case is about foreign activities and not the United States.

10    The Ninth Circuit has made clear that claims "relat[ing] only to foreign commerce" are

11    outside the reach of the U.S. antitrust laws. *McGlinchy*, 845 F.2d at 815. In *McGlinchy*,

12    defendant Shell terminated the plaintiff as its foreign distributor of oil. *Id.* The Ninth Circuit

13    affirmed dismissal of the antitrust claims under the FTAIA, explaining any potential injury to

14    foreign customers lacked "the requisite domestic anticompetitive effect." *Id.* at 813–15.

15    Similarly, in *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004), the Ninth

16    Circuit affirmed dismissal where a U.S. company prevented its competitor from selling a

17    particular tomato seed in North America, which allegedly resulted in higher prices and reduced

18    innovation in the United States. *Id.* at 675, 680–83. The Ninth Circuit held that this alleged effect

19    on U.S. commerce was not "direct" because it was not an "immediate consequence" of the

20    foreign conduct and instead depended on "uncertain intervening developments." *Id.* at 681–83.

21    The same flaws are present here: Subspace provided services to Epic in the Middle East

22    to improve the experience of gamers in the Middle East. Compl. ¶¶ 3, 59. The termination of that

23    relationship lacks the "requisite domestic anticompetitive effect" and would not be the

24    "immediate consequence" of the challenged conduct.

25    Subspace's generalized allegations of harm to consumers and harm to its relationship

26    with Epic do nothing to change this conclusion. Subspace repeats a conclusory allegation that

MOTION TO DISMISS – 16
(NO. 2:23-CV-01772-TL)

1   "consumers have been deprived of the full benefits of competition in the relevant market," *id.*

2   ¶¶ 160, 169, 176, 185, but that is entitled to no weight. *See Iqbal*, 555 U.S. at 678 ("[T]hreadbare

3   recitals of the elements of a cause of action, supported by mere conclusory statements, do not

4   suffice."). This conclusory allegation is also not specific to U.S. commerce and falls far short of

5   establishing the required direct, substantial, and reasonably foreseeable effect on U.S. commerce.

6   *See, e.g.*, *LSL*, 379 F.3d at 681–82 (holding impact on U.S. commerce from exclusion of

7   competitor outside the United States was "speculative at best and doubtful at worst");

8   *McGlinchy*, 845 F.2d at 813, 815 (finding insufficient allegations of U.S. effects where plaintiff

9   alleged it "was and is now engaged in the domestic and overseas business" and there was "injury

10   to competition in the United States in the relevant market"); *In re Intel Corp. Microprocessor*

11   *Antitrust Litig.*, 452 F. Supp. 2d 555, 560–63 (D. Del. 2006) (dismissing for lack of U.S. effects

12   where plaintiff alleged "world-wide market" and that foreign conduct harmed plaintiff's ability

13   to compete in the United States and caused higher U.S. prices).

14        Finally, Subspace alleges that Epic "considered expanding its business relationship with

15   Subspace" to provide global "acceleration" services that establish the required effect on U.S.

16   commerce. Compl. ¶ 101. Again, this speculation is not tied to the United States and, in any case,

17   alleging that Epic was *considering* some change to its relationship with Subspace does not

18   plausibly allege a direct, substantial, and reasonably foreseeable effect on U.S. commerce. *See*

19   *LSL*, 379 F.3d at 680–82 (dismissing claim based on lack of requisite U.S. effect where any U.S.

20   effect depends on "uncertain intervening developments"); *In re Intel*, 452 F. Supp. 2d at 560–61

21   (rejecting alleged causal connection premised on "a multitude of speculative and changing

22   factors affecting business and investment decisions").

23   **II. Subspace's miscellaneous claims also fail.**

24        Finally, Subspace brings state antitrust and tortious interference claims as well as a

25   Communications Act claim. All of them fail.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**A.    State antitrust claims (Counts III, IV, VII) fail for the same reasons as the federal claims.**

Subspace's state antitrust claims fail along with the meritless federal antitrust claims. The Washington Consumer Protection Act is "patterned after Sections 1 and 2 of the Sherman Antitrust Act," *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021), and "in construing [the WCPA], the courts [shall] be guided by final decisions of the federal courts . . . interpreting the various federal statutes dealing with the same or similar matters," Wash. Rev. Code § 19.86.920. Thus, where courts dismiss federal antitrust claims, they also dismiss parallel WCPA claims. *See, e.g., PBTM*, 511 F. Supp. 3d at 1178–82 (dismissing WCPA claims by applying the same analysis as applied to federal antitrust claims).[3]

**B.    Tortious interference claim (Count V) fails for lack of a wrongful act.**

A claim for tortious interference with contract in violation of Washington law requires, among other things, actions that are independently wrongful under a statute, regulation, common law, or established standard of trade or profession. *Moore v. Com. Aircraft Interiors, LLC*, 168 Wash. App. 502, 510 (2012) (rejecting claim where plaintiffs failed to show alleged interference was wrongful under separate statute). The only potential wrongful acts are the antitrust claims and the Communications Act claim, but those acts are not wrongful for the reasons explained above and below. Thus, the tortious interference claim also fails.

**C.    Communications Act claim (Count VI) fails because Subspace ignores existing law and relies on a proposal that would change the law only prospectively.**

Subspace alleges that AWS's peering arrangement in dispute during the years 2019 through 2022 violated Section 201(b) of the Communications Act, which applies exclusively to telecommunications common carriers. Subspace's claim fails.

---

[3] These claims also fail because Subspace cannot establish at least two additional elements required under the WCPA: (1) an unfair or deceptive act or practice that (2) affects the public interest. *See, e.g., Keodalah v. Allstate Ins. Co.*, 194 Wash. 2d 339, 349–50 (2019). First, Subspace has not alleged an "unfair or deceptive practice" that has "the capacity to deceive a substantial portion of the public." *Segal v. Amazon.com*, 280 F. Supp. 2d 1229, 1232–33 (W.D. Wash. 2003) (dismissing WCPA claims where "the complaint in no way indicates that defendant's conduct extended beyond the two parties to the alleged contract"). Second, this is merely a private dispute between two businesses that does not affect the public interest. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 790, 794 (1986) (holding public interest element not met where "the context in which these acts occurred was that of an essentially private transaction").

MOTION TO DISMISS – 18
(NO. 2:23-CV-01772-TL)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

To support its interpretation of the Communications Act, Subspace cites to a 2023 FCC proposal that seeks to *change* the existing law that has been in place since 2018. Compl. ¶¶ 204–06 (citing *In the Matter of Safeguarding and Securing the Open Internet, Notice of Proposed Rulemaking*, WC Docket No. 23-320, FCC 23-83 ¶¶ 65–66, 70, 73, 168 (released Oct. 20, 2023) ("Open Internet NPRM")). The Open Internet NPRM proposed to reclassify unregulated broadband internet access services as regulated telecommunications services, essentially by changing how existing FCC law interprets the Communications Act. Open Internet NPRM, ¶¶ 68–70. Subspace argues that the Open Internet NPRM's proposed new interpretation of the Communications Act is "reasonable" and therefore "this Court must defer to [the proposed rule's] interpretation." Compl. ¶ 206. But Subspace fails to disclose that the Open Internet NPRM is not law; instead, the FCC's final rule (adopted in 2018) was the governing law throughout the period in dispute. In this final rule, known as Restoring Internet Freedom, 83 Fed. Reg. 7852 (Feb. 22, 2018) (amending 47 C.F.R. §§ 1, 8, 20), the FCC determined that under the Communications Act internet traffic exchange services, including peering arrangements, are unregulated "information services," not FCC-regulated common carrier telecommunications services. *Id*. at ¶¶ 144–54. Thus, under the existing law applicable to the conduct during 2019 through 2022, any dispute regarding peering arrangements could not violate Section 201(b) because they were not considered a telecommunications common carrier service under the Communications Act. *Id*.

As for the Open Internet NPRM, if a final rule that changes existing law is adopted in that rulemaking proceeding, it will apply only *prospectively*. The FCC's final rule will not take effect until at least 30 days after its publication in the Federal Register. *See* 5 U.S.C. § 553(d) & 47 C.F.R. § 1.427 (specifying this timing). There is no provision for retroactive application, and therefore regardless of the final rule's substance, it cannot be applied retroactively to the conduct in dispute during the years 2019 through 2022.

MOTION TO DISMISS – 19
(NO. 2:23-CV-01772-TL)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  In short, Subspace's claim fails because it relies on a fundamental misstatement of the

2  existing law that governed the conduct in dispute.

3  **CONCLUSION**

4  For all of these reasons, AWS respectfully requests that Subspace's Complaint be

5  dismissed in its entirety. Further, because these flaws are fundamental and cannot be cured by

6  amendment the Complaint should be dismissed with prejudice.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   Respectfully submitted this 8th day of April, 2024.

2

3                                        *I certify that this memorandum contains 6,884*
4                                        *words, in compliance with the Local Civil Rules.*

5

6          By:  s/ Kenneth S. Reinker

7                 Kenneth S. Reinker (*pro hac vice*)
                  George S. Cary (*pro hac vice*)
8                 Alan B. Freedman (*pro hac vice*)

9                 **Cleary Gottlieb Steen & Hamilton LLP**
10                2112 Pennsylvania Avenue, NW
                  Washington, DC 20037
11                Telephone: +1-202-974-1500
                  kreinker@cgsh.com
12                gcary@cgsh.com
                  afreedman@cgsh.com
13

14

15                s/ Shylah R. Alfonso

16                Shylah R. Alfonso, WSBA No. 33138
                  Tiffany L. Lee, WSBA No. 51979
17

18                **Perkins Coie LLP**
                  1201 Third Avenue, Suite 4900
19                Seattle, Washington 98101-3099
                  Telephone: +1-206-359-8000
20                Facsimile: +1-206-359-9000
                  salfonso@perkinscoie.com
21                tiffanylee@perkinscoie.com

22                *Attorneys for Defendant*
                  *Amazon Web Services, Inc.*
23

24

25

26

MOTION TO DISMISS – 21
(NO. 2:23-CV-01772-TL)

1

2                        **CERTIFICATE OF CONFERRAL**

3          Pursuant to Section III.G of this Court's Standing Order for All Civil Cases, the

4   undersigned counsel for Defendant AWS certifies that on April 4, 2024 the parties held a

5   telephonic conference to discuss the substance of AWS's Motion to Dismiss. Plaintiff had the

6   opportunity to amend its pleading before the filing of this Motion.

7

8

9          Dated: April 8, 2024              By:  s/ Kenneth S. Reinker____
                                                  Kenneth S. Reinker
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF CONFERRAL
(NO. 2:23-CV-01772-TL)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000