1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SUBSPACE OMEGA, LLC,

                    Plaintiff,

     v.

AMAZON WEB SERVICES, INC.,

                    Defendant.

CASE NO. 2:23-cv-01772-TL

ORDER ON MOTION TO DISMISS

       This is an antitrust action under the Sherman Act for damages and injunctive relief for the alleged monopolization or attempted monopolization of markets related to internet data connection services, as well as related claims. This matter is before the Court on Defendant Amazon Web Services, Inc.'s Motion to Dismiss Amended Complaint Under Rule 12(b)(6) (Dkt. No. 32). Having reviewed Plaintiff Subspace omega, LLC's response (Dkt. No. 35), Defendant's reply (Dkt. No. 36), Plaintiff's notice of supplemental authority (Dkt. No. 43), and the relevant record, and having held oral argument (Dkt. No. 49), after which the Parties made

additional filings that were also reviewed (Dkt. Nos. 50, 53), the Court GRANTS the motion with limited leave to amend.

## I.    BACKGROUND

The following allegations are recited as pleaded in the Amended Complaint.

**A.    The Internet and Peering**

The internet is a global system of interconnected computer networks that exchange data with one another. Dkt. No. 25 ¶ 19. Two networks can connect with each other in two primary ways: (1) "peering," which denotes a direct connection between two networks; or (2) "transit," which provides access to any destination network using any available routing paths, including those of third parties. *Id.* ¶¶ 21–23.

Network "latency" or "lag" measures the time it takes for data transmitted over the internet to reach its destination following the instruction of its transfer by a user. *Id.* ¶ 25. "Low latency" means faster network communication and a better user experience; "high latency" means slower transmission. *Id.* ¶¶ 25–27. "Network optimization" is an iterative process that seeks to improve network performance and reliability through various means, including managing network traffic volume and latency, controlling traffic direction, and band steering (*i.e.*, the automatic assignment of a Wi-Fi client to the optimal wireless network). *Id.* ¶ 31.

Peering generally reduces latency and results in an improved user experience. *See id.* ¶¶ 35–39, 41, 43–44. Parties will typically enter a "settlement-free" (*i.e.*, no charge) peering agreement when they have "similar profiles" and the information exchanged between them is balanced. *Id.* ¶ 40. Where there is significant asymmetry in volumes of data, peering is typically paid for and formal agreements are negotiated. *Id.* ¶ 42.

**B.    The Parties**

Plaintiff Subspace omega LLC, founded in 2017, was a provider of network optimization services. *Id.* ¶¶ 52–53. Plaintiff provided its services using over 136 "Internet Exchange Points" ("IX" or "IXP") (*i.e.*, geographic locations where internet traffic is exchanged) and settlement-free peering arrangements with major network providers. *Id.* ¶¶ 46, 55–57. Plaintiff focused on increasing its IX participation to reduce latency, and it offered real-time dynamic protection against distributed denial-of-service attacks (which bombard a website with fraudulent request to disable it from responding to legitimate requests) using a proprietary method that did not add latency. *Id.* ¶¶ 58–59. Plaintiff's servicers were used by low-latency-dependent applications like VoIP (Voice Over Internet Protocol) and video streaming. *Id.* ¶ 61. Plaintiff's services depended upon settlement-free peering. *Id.* ¶ 62

Defendant Amazon Web Services, Inc., is the largest cloud computing and hosting services company in the world. *Id.* ¶ 78. Defendant offers its services as part of its "Infrastructure as a Service" ("IaaS") product. *Id.* In 2022, Defendant held 40 percent of the global IaaS cloud computing market. *Id.* ¶ 79.

Once a content provider selects a cloud computing and hosting provider, all data traffic must be transmitted via that network. *Id.* ¶ 94. To that end, Defendant offers three means of network interconnection: (1) public peering, (2) private peering, and (3) a service called "Direct Connect." *Id.* ¶ 80. Public or private peering involves direct routes to and from Defendant's network. *Id.* ¶ 81. Public peering occurs through Defendant's 160 public IXPs. *Id.* ¶ 82. Private peering is direct connection with Defendant's network without an interconnecting IXP router. *Id.* ¶ 83. Direct Connect is not a peering service but rather a paid product to exchange traffic with Defendant. *Id.* ¶¶ 84, 86. Prior to 2022, Defendant had peering standards that permitted service providers that met certain technical guidelines to peer with Defendant's network on a settlement-

1    free basis. *Id.* ¶¶ 85, 158. At all relevant times, Plaintiff met the technical guidelines. *Id.* ¶ 159.

2    Defendant also had peering "best practices," which Plaintiff also satisfied. *Id.* ¶ 160. In early

3    2022, after Plaintiff complained to Defendant about its conduct, Defendant amended its peering

4    policy to include a mention of Direct Connect. *Id.* ¶ 86.

5            Defendant also offers products that compete directly with network optimization service

6    providers. *Id.* ¶ 92. These products include Global Accelerator, which Defendant describes as a

7    networking service that helps improve network performance of public applications. *Id.*

8    Defendant recommends this product for use with "[l]ow latency gaming," claiming that it

9    provides "custom routing to deterministically route traffic." *Id.* They also included Cloud WAN,

10   released in late 2021, which is a vertically integrated product that similarly offered network

11   optimization services to Defendant's network users. *Id.*

12   **C.      Plaintiff's Deal with Epic Games and Initial Cooperation with Defendant**

13           Plaintiff's largest customer was Epic Games ("Epic"), one of the world's largest and most

14   successful video game and software developers and publishers. *Id.* ¶¶ 60, 64. Epic is the

15   developer and publisher of "Fortnite," a competitive multiplayer online game with nearly half a

16   billion players globally. *Id.* ¶ 64. Fortnite requires low-latency connections, as a player's in-game

17   actions can be negated or improved by the speed of their connection. *Id.* ¶ 67.

18           Since at least 2018, Epic operated Fortnite using Defendant's network. *Id.* ¶ 65. However,

19   in advance of a major marketing event in August 2019 requiring enhanced connections in the

20   Middle East, it became clear that Defendant would not have the infrastructure in place to support

21   Epic's needs. *Id.* ¶¶ 69–71. Thus, on June 21, 2019, Plaintiff and Epic entered a Platform Access

22   Agreement by which Plaintiff would provide network optimization services. *Id.* ¶ 68. As part of

23   its services to Epic, Plaintiff requested peering with Defendant at certain locations, including

24

Mumbai, India; Dubai and Fujairah City in the United Arab Emirates; and Bahrain. *Id.* ¶ 127. Defendant agreed to do so, and by July 2019, the peering was established. *Id.* ¶ 128.

Epic was so satisfied with Plaintiff's services that it considered expanding its business relationship with Plaintiff. *Id.* ¶ 129. In January 2020, in furtherance of that expansion, Plaintiff asked Defendant for additional peering in Frankfurt, Germany. *Id.* ¶ 130. Epic confirmed that request to Defendant directly on February 7, 2020, asking Defendant to "work with [Plaintiff] to establish the peering relationships they've mentioned." *Id.* Defendant initially indicated that it would establish the additional requested peering, and in February 2020, Defendant, Epic, and Plaintiff engaged in a series of communications to work out the logistics. *Id.* ¶ 131.

**D.      Defendant's Alleged Anticompetitive Behavior**

On March 17, 2020, Defendant told Plaintiff that it had decided not to move forward with peering in Frankfurt and suggested Direct Connect instead. *Id.* ¶ 132. That decision was made by Rob Kennedy, Defendant's then-Director of Global Network Connectivity. *Id.* ¶ 133. Defendant continued to allow peering with other entities who did not offer a competitive network optimization service. *Id.* ¶ 134.

Plaintiff attempted over a series of months to test whether Direct Connect would meet its needs. *Id.* ¶ 135–37. However, Plaintiff noticed a material deterioration in the quality of its services, as well as numerous technical and overbilling problems. *Id.* ¶¶ 138–39. Plaintiff raised these problems with Defendant on multiple occasions, but despite some conversations, the problems continued. *Id.* ¶¶ 140–45. The problems persisted for over a year, leading Plaintiff to conclude that Direct Connect was not a viable alternative to peering. *Id.* ¶ 146.

In early November 2021, Defendant suggested that it would be willing to again discuss potential peering arrangements with Plaintiff. *Id.* ¶ 147. Plaintiff responded with four peering requests on November 4, covering various IXPs in Asia and Australia; India; Europe and Africa;

and North America. *Id.* ¶ 148. When Defendant did not respond for over a week, Plaintiff sent to Defendant a Notice of Anticompetitive Behavior, including a stated intention to file a complaint with the Federal Trade Commission if Defendant did not respond within seven days. *Id.* ¶¶ 149–50. After the Notice was sent, Defendant sent to Plaintiff requests for peering at two IXPs in Los Angeles and Denver. *Id.* ¶ 151. Plaintiff made technical preparations for those connections and made additional peering requests for 10 other sites, to which Defendant was "receptive." *Id.* ¶¶ 151–52. On November 17, Plaintiff and Defendant spoke about the Notice and peering requests, and Plaintiff followed up later to encourage further discussion. *Id.* ¶ 153.

However, in an email on November 18, 2021, Defendant stated that it agreed to peering in certain locations but "pressured [Plaintiff] to shift public peering to Direct Connect connections if traffic levels exceeded a certain threshold." *Id.* ¶ 154. Defendant "even attempted to force [Plaintiff] to terminate already-established private peering sessions at certain Middle East and India locations altogether, replacing them with Direct Connect connections if traffic exceeded a certain threshold and with public peering if traffic fell below that threshold." *Id.* Plaintiff thus concluded that Defendant had no intention of peering, and on November 21, Plaintiff told Defendant that it was engaged in anticompetitive behavior. *Id.* ¶ 155. Based on Defendant's promise of expanded peering, Plaintiff had invested in 30 data centers in Europe and an equal number in the United States. *Id.* ¶ 156.

In February 2022, Plaintiff was forced to terminate its contract with Epic "due to the degradation of its service that [Defendant] had caused by refusing to peer." *Id.* ¶ 177. On May 31, 2022, Plaintiff was forced to cease operations "as a direct result of [Defendant's] refusal to continue to support peering with [Plaintiff]." *Id.* ¶ 178. After Plaintiff went out of business, Defendant took Plaintiff's place in providing network optimization services to Epic. *Id.* ¶ 179.

**E.    The Alleged Markets**

Plaintiff alleges three relevant markets for its monopolization claims. *See id.* ¶¶ 96–114. First, Plaintiff alleges the "AWS Network" market, in which Defendant has a 100% market share because it controls the relevant interconnection facilities and who can peer with it. *Id.* ¶ 96. Defendant imposes substantial penalties and disincentives for users who attempt to migrate to other networks. *Id.* ¶ 98. The threat of these penalties coerces Defendant's users into adopting Defendant's other products and services, which in turn further keeps users from switching to another network. *Id.* ¶¶ 99–101.

Second, Plaintiff alleges the "cloud computing" market, in which Defendant has "at least" a 40% market share and a "dangerous probability" of gaining a 60–70% share "in the near future." *Id.* ¶¶ 102–103. Between 2020 and 2023, Defendant doubled its revenue from $45.3 billion to $90.8 billion, and it recently announced its intention to invest $148 billion "to increase its footprint in the market." *Id.* ¶¶ 104–105.

Third, Plaintiff alleges the "low latency network optimization on AWS" market, in which Defendant has at least a 60% share. *Id.* ¶ 110. Defendant attempts to force customers to use its other products like Global Accelerator and Cloud WAN that are lower quality that those of competitors. *Id.* ¶ 111. Because of the costs of switching from Defendant to another provider, Defendant can force its users to use its inferior products without fear of losing the user. *Id.* ¶ 113.

The geographical scope for all these markets is the world. *Id.* ¶¶ 115–17.

**F.    Procedural History**

On November 18, 2023, Plaintiff filed its initial Complaint and commenced this action. Dkt. No. 1. On April 29, 2024, Plaintiff filed an Amended Complaint. Dkt. No. 25. On June 3, Defendant filed the instant motion to dismiss the Amended Complaint. Dkt. No. 32; *see also* Dkt. No. 36 (reply). Plaintiff opposes. Dkt. No. 35.

## II.    LEGAL STANDARD

A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. "When reviewing a dismissal pursuant to Rule . . . 12(b)(6), 'we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[ ], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

## III.    DISCUSSION

### A.    Sherman Act

Plaintiff brings four federal antitrust claims. *See* Dkt. No. 25 ¶¶ 193–199 (Count One: Monopolization of the AWS Network Market), 200–203 (Count Two: Attempted Monopolization of the Cloud Computing Market), 204–210 (Count Three: Monopolization of the Market for Low Latency Network Optimization Services on AWS), 211–214 (Count Four: Attempt to Monopolize the Market for Low Latency Network Optimization Services on the AWS Network).

Section 2 of the Sherman Act states in relevant part that a person shall not "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with

foreign nations." 15 U.S.C. § 2. "To establish liability under § 2, a plaintiff must show: '(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'" *Fed. Trade Comm'n v. Qualcomm*, 969 F.3d 974, 990 (9th Cir. 2020) (quoting *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)). Defendant challenges the sufficiency of Plaintiff's allegations as to every element.

### 1.    Possession of Monopoly Power in Relevant Markets

"A threshold step in any antitrust case is to accurately define the relevant market." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023). "[A] relevant market defines 'the field in which meaningful competition is said to exist.'" *Id.* (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)). "The principle most fundamental to product market definition is cross-elasticity of demand for certain products or services," which refers to "the extent to which consumers view two 'products [as] be[ing] reasonably interchangeable' or substitutable for one another." *Id.* (first quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979); then quoting *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013)) (alterations in original) (internal quotation marks omitted). "A relevant market contains both a geographic component and a product or service component." *Id.* (quoting *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023)). "Courts also consider the 'practical indicia' of a market, including industrial or public recognition of a market as a separate entity or sensitivity to price changes." *Id.* (quoting *Epic Games*, 67 F.4th at 976).

Plaintiff alleges three relevant markets. *See* Dkt. No. 25 ¶¶ 96–101 (AWS network), 102–109 (cloud computing), 110–114 (low latency network optimization on AWS). As an initial matter, contrary to Plaintiff's assertion (*see* Dkt. No. 35 at 13), it is proper to evaluate alleged markets at the motion-to-dismiss stage, and a court may dismiss a claim on this basis if a relevant

market is not properly alleged. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) (affirming district court's conclusion that plaintiffs failed to allege a relevant product market, which supported dismissal of antitrust claims on a motion to dismiss). The Court first considers the alleged "single brand" markets, then turns to the cloud computing market.

        a.        ***"AWS Network" and "Low Latency Network Optimization on AWS"***

Defendant challenges the alleged AWS-based markets as improper single-product or single-brand markets, which courts "regularly reject . . . where other alternatives are available." Dkt. No. 32 at 20. In response, Plaintiff notes that courts do recognize single-product markets, and that Defendant's control of its cloud, and who gets to peer with it, defines the relevant markets. *See* Dkt. No. 35 at 14–15. In reply, Defendant argues that "AWS's network is not an aftermarket, but a primary market that competes with other clouds" (Dkt. No. 36 at 12), and that Plaintiff's network optimization services "are not limited to a single primary market," making the aftermarket case law "inapplicable" here (*id.* at 13).

"'Single-brand markets are, at a minimum, extremely rare' and courts have rejected such market definitions '[e]ven where brand loyalty is intense.'" *Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) (quoting *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008)). "The Supreme Court and Ninth Circuit have only found single-brand markets plausible in the context of *aftermarkets* which are 'wholly derivative from and dependent on the primary market,'" *id.* (emphasis in original) (quoting *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1049 (9th Cir. 2008)), though neither "has explicitly addressed" whether single-brand markets are "limited" to aftermarkets, *Hogan v. Amazon.com, Inc.*, No. C21-996, 2024 WL 1091671, at *5 (W.D. Wash. Mar. 13, 2024), *appeal filed*, No. 24-1893 (9th Cir. Mar. 29, 2024). *See also Epic Games*, 67 F.4th at 976 ("[I]n some instances one brand of a product can constitute a separate market." (alteration in original) (quoting *Eastman Kodak Co. v. Image Tech. Servs.*,

1    *Inc.*, 504 U.S. 451, 482 (1992))). "While single brand markets are not favored," a plaintiff can

2    overcome the presumption "if they alleged that the product is 'so unique or so dominant in the

3    market in which they compete' that there are no economic substitutes available to consumers."

4    *Hogan*, 2024 WL 1091671, at *5 (quoting Phillip E. Areeda & Herbert Hovekamp, *Antitrust

5    Law: An Analysis of Antitrust Principles & Their Application* ¶ 563 (4th & 5th eds. 2018–2023)).

6         Finally, an "aftermarket" is a "derivative" market "for products related to or dependent

7    on a specific company's products." *Psystar Corp.*, 586 F. Supp. 2d at 1196; *see also Coronavirus

8    Rptr.*, 85 F.4th at 955 (describing aftermarkets "in which demand depends entirely upon prior

9    purchases in a foremarket"). "[T]o establish a single-brand aftermarket, a plaintiff must show:

10   (1) the challenged aftermarket restrictions are 'not generally known' when consumers make their

11   foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing;

12   (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-

13   definition principles regarding cross-elasticity of demand do not undermine the proposed single-

14   brand market." *Epic Games*, 67 F.4th at 977.

15        The Court finds that the "AWS Network" is not a properly defined relevant market. As in

16   *Psystar*, Plaintiff "alleges not a single-brand aftermarket dependent on and derivative of a

17   specific company's primary product but instead that a single brand of primary product"—there,

18   Apple's operating system; here, Defendant's network—that "constitutes an independent market."

19   586 F. Supp. 2d at 1197. While the Ninth Circuit has not foreclosed single-brand markets other

20   than aftermarkets, such markets are "extremely rare," *Reilly*, 578 F. Supp. 3d at 110, and

21   Plaintiff does not demonstrate that the AWS Network is "so unique or so dominant" such that

22   there are no economic substitutes, *Hogan*, 2024 WL 1091671, at *5. Moreover, Plaintiff supplies

23   no cases where courts have recognized a single brand of *primary* product as a relevant market,

24   and the cases it does provide (Dkt. No. 50 at 17) are distinguishable. *See In re Google Play Store*

1    *Antitrust Litig.*, No. C20-5671, 2024 WL 3302068, at *5 (N.D. Cal. July 3, 2024) (concluding

2    that "there was no 'single brand' in play here" where devices running Android, an operating

3    system, were "manufactured by many companies"), *appeal filed*, No. 24-6256 (9th Cir. Oct. 15,

4    2024); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 804 (N.D. Ill. 2019) (noting

5    that plaintiffs allege "a brand-specific 'Dealer Data Integration *aftermarket'* limited to its own

6    [software]" (emphasis added)). The mere fact that Epic chose Defendant to host its Fortnite game

7    (*see* Dkt. No. 35 at 14) does not transform Defendant's network into its own market.

8         However, the Court finds that "low latency network optimization on AWS" may be a

9    relevant market—namely, a single-brand aftermarket derivative of Defendant's network. After

10   all, demand in this market is dependent on the prior purchase of Defendant's services: Plaintiff

11   alleges that "[t]here is a distinct market for low latency network optimization for companies such

12   as Epic Games that use [Defendant] and require low latency connections with their customers," a

13   market in which Defendant "has at least a 60% share." Dkt. No. 25 ¶ 110. Defendant "imposes

14   substantial penalties and disincentives for users who attempt to migrate to other networks" and

15   deploys "various other tactics to keep companies to migrating to another cloud," including a

16   suite of "ancillary products and services" that result in a company becoming "thoroughly

17   enmeshed in the AWS cloud." *Id.* ¶¶ 98, 100–101. Defendant thus "locks in" a customer and can

18   use its power "to deny peering to other service providers, which effectively forces [its] customers

19   to use related services" it sells, like AWS Global Accelerator and AWS Cloud WAN. *Id.* ¶ 120–

20   121. Still, while Plaintiff's allegations address (at least to some degree) the existence of

21   switching costs, they do not appear to address the other elements required of a single-brand

22   aftermarket, such as consumer knowledge of restrictions at time of foremarket purchase, or

23   information costs. *See Epic Games*, 67 F.4th at 977. Therefore, Plaintiff will be given leave to

24   amend its allegations as to this proposed market.

1

### b. *Cloud Computing*

2          Defendant does not meaningfully challenge "cloud computing" as a relevant market,[1] but

3  argues instead that Plaintiff does not sufficiently allege a "dangerous probability" of Defendant's

4  achieving monopoly power "in the near future," as needed to support its claim for attempted

5  monopolization. *See* Dkt. No. 32 at 21. In response, Plaintiff argues that Defendant is making "a

6  fact-based argument, more suited for summary judgment or trial," and notes its own allegation

7  that its potential growth would have enabled Defendant's customers to leave Defendant's cloud.

8  *See* Dkt. No. 35 at 15–16.

9          "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant

10  has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and

11  (3) a dangerous probability of achieving monopoly power." *Cascade Health Sols. v.*

12  *PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quoting *Spectrum Sports, Inc. v. McQuillan*,

13  506 U.S. 447, 456 (1993)). "Monopoly power is 'the power to control prices or exclude

14  competition.'" *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012,

15  1022 (N.D. Cal. 2016) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).

16  "'[T]o determine whether there is a dangerous probability of monopolization,' courts 'consider

17  the relevant market and the defendant's ability to lessen or destroy competition in that market.'"

18  *Id.* (quoting *Spectrum Sports*, 506 U.S. at 456).

19          The Court finds that Plaintiff has not sufficiently alleged a "dangerous probability" that

20  Defendant will achieve monopoly power in the cloud computing market, though it may be able

21  to cure the deficiencies with amendment.

22

23

24  [1] Defendant only states in a footnote that it "also disputes that cloud computing is an appropriately defined market, which it will demonstrate through discovery if necessary." Dkt. No. 32 at 21 n.5.

1    Plaintiff alleges that Defendant "already has at least a 40% market share for cloud

2 computing and has a dangerous probability of gaining a 60–70% share in the near future" (Dkt.

3 No. 25 ¶ 103), and "the Ninth Circuit has held [on summary judgment] that a 44% market share

4 was sufficient as a matter of law to support a finding of market power for attempted

5 monopolization," *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035 (C.D. Cal. 2007)

6 (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995)). Moreover,

7 between 2020 and 2023, Defendant's revenue doubled from $45.3 billion to $90.8 billion, and it

8 recently announced its intention to invest $148 billion in the coming years "to increase its

9 footprint in the market." *Id.* ¶ 104–105. Further, "[a]s a cloud platform with monopoly power,

10 only [Defendant] could change its terms of service to eliminate peering with [Plaintiff] without

11 losing one of its biggest customers [Epic]." *Id.* ¶ 122. "The main rivals to [Defendant] in cloud

12 computing have not restricted peering in the way [Defendant] has." *Id.* "A successful and

13 growing [Plaintiff] would have facilitated the migration of [Defendant] customers away from

14 [Defendant] and on to other cloud platforms." *Id.* ¶ 201.

15    Defendant argues that these allegations amount simply to the fact that Defendant "invests

16 in itself" (Dkt. No. 36 at 13) within a market that is collectively growing (*see* Dkt. No. 32 at 21

17 (citing Dkt. No. 25 ¶ 79)) and are thus insufficient. For its argument, Defendant cites no legal

18 authority or analogous cases. The Court agrees with Plaintiff that this is "a fact-based argument,

19 more suited for summary judgment or trial." Dkt. No. 35 at 15.

20    However, the Ninth Circuit held that a 44-percent market share was sufficient "if entry

21 barriers are high and competitors are unable to expand their output in response to

22 supracompetitive pricing." *Rebel Oil*, 51 F.3d at 1438; *accord Biddle v. Walt Disney Co.*, 696

23 F.Supp.3d 865, 883 (N.D. Cal. 2023); *Catch Curve*, 519 F. Supp. 2d at 1035. Plaintiff does not

24 allege these market conditions. Plaintiff may amend its claim to address these factors.

1

2.    **Refusal to Deal**

2    "To safeguard the incentive to innovate, the possession of monopoly power will not be

3    found unlawful [under § 2] unless it is accompanied by an element of anticompetitive *conduct*."

4    *Qualcomm*, 969 F.3d at 990 (emphasis in original) (quoting *Verizon Commc'ns Inc. v. Law Offs.*

5    *of Curtis V. Trinko, LLP* ("*Trinko*"), 540 U.S. 398, 407 (2004)). "Accordingly, plaintiffs are

6    required to prove 'anticompetitive abuse or leverage of monopoly power, or a predatory or

7    exclusionary means of attempting to monopolize the relevant market.'" *Id.* (quoting *Allied*

8    *Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010)).

9    "As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the

10    terms and conditions preferred by [a competitor's] rivals[.]'" *Aerotec Int'l, Inc. v. Honeywell*

11    *Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (quoting *Pac. Bell Tel. Co. v. Linkline*

12    *Commc'ns, Inc.*, 555 U.S. 438, 457 (2009)). Moreover, "as a general matter, the Sherman Act

13    'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely

14    private business, freely to exercise his own independent discretion as to parties with whom he

15    will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307

16    (1919)). "That is because the antitrust laws, including the Sherman Act, 'were enacted for 'the

17    protection of *competition*, not *competitors*.'" *Qualcomm*, 969 F.3d at 993 (emphasis in original)

18    (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).

19    However, under the "one, limited exception to this general rule," a refusal to deal is a

20    violation of the Sherman Act when (1) the defendant "unilateral[ly] terminat[es] . . . a voluntary

21    and profitable course of dealing," (2) "the only conceivable rationale or purpose is to sacrifice

22    short-term benefits in order to obtain higher profits in the long run from the exclusion of

23    competition," and (3) "the refusal to deal involves products that the defendant already sells in the

24    existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993–94 (citations

1    and quotation marks omitted).[2] It derives from the United States Supreme Court's decision in

2    *Aspen Skiing Company v. Aspen Highlands Skiing Corporation*, in which the high court held that

3    the owner of three skiing mountains in Aspen, Colorado, violated the Sherman Act when it

4    abruptly discontinued a profitable marketing arrangement (and, indeed, all business dealings)

5    with the owner of the fourth and only other mountain. 472 U.S. 585 (1985). This exception sits

6    "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

### a.    *Termination of Prior Course of Dealing*

8        Defendant argues that Plaintiff does not allege the termination of a prior course of

9    dealing, pointing out that the only alleged dealing—peering in the Middle East—is *not* alleged to

10   have been terminated. *See* Dkt. No. 32 at 15–16. Defendant also argues that the Sherman Act

11   does not require it to expand its prior dealing. *See id.* at 16. In response, Plaintiff argues that it

12   makes "explicit allegations" that Defendant terminated "prior peering" with Plaintiff and

13   "effectively excluded" Plaintiff from its platform. Dkt. No. 35 at 18. Plaintiff further argues that

14   it "merely sought continuation of the same terms and conditions [Defendant] had previously

15   extended to [Plaintiff] and uniformly applied to other comparable companies." *Id.* at 19.

16       The Court finds that Plaintiff has sufficiently alleged that Defendant "unilateral[ly]

17   terminat[ed] . . . a voluntary and profitable course of dealing." *Qualcomm*, 969 F.3d at 993.

18   Plaintiff alleges that peering is standard industry practice (*see* Dkt. No. 25 ¶¶ 40–48), and that

19   prior to 2022, Defendant had "objective peering standards permitting service providers that met

20   [Defendant's] technical guidelines to peer with the AWS Network on a settlement-free basis"

---

[2] Plaintiff appears to argue that these elements are not required but are merely guidance for a court to identify anticompetitive conduct. *See* Dkt. No. 35 at 21 (quoting *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468, 482 (D.R.I. 2018)). The Court disagrees and understands *Qualcomm* and related cases to hold that these are required elements. *See, e.g.*, *Philips N. Am., LLC v. Summit Imaging Inc.*, No. C19-1745, 2020 WL 6741966, at *6 (W.D. Wash. Nov. 16, 2020) ("This Court is bound to follow Ninth Circuit precedent.").

(*see id.* ¶ 85). Plaintiff also alleges that peering was possible and beneficial to Defendant. *See id.* ¶¶ 161–164. Defendant initially agreed to peer with Plaintiff (*see id.* ¶¶ 126–128), but it declined to approve additional peering requests, despite its standard practice and Plaintiff's satisfaction of all of Defendant's technical guidelines and best practices (*see id.* ¶¶ 132–134, 144–145, 151–155, 158–160). Instead, Defendant offered Direct Connect, which Plaintiff alleges "was not a viable alternative to peering." *Id.* ¶ 146; *see id.* ¶¶ 135–145 (describing problems with the service). Under this new arrangement, Plaintiff was unable to provide its services to customers like Epic that used the AWS Network. *See id.* ¶¶ 173–181.

As in *Aspen Skiing*—where the defendant offered the plaintiff participation in the marketing arrangement but only at a historically low revenue rate—Defendant's offer of Direct Connect to Plaintiff was "an offer that [Plaintiff] could not accept." 472 U.S. at 592. While it is true that "there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals,'" *Aerotec*, 836 F.3d at 1184 (quoting *Pac. Bell Tel. Co.*, 555 U.S. at 457), it is also true that "[a]n offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal," *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004). Here, on a motion to dismiss, Plaintiff's allegations are sufficient to establish that Defendant's offered substitution of Direct Connect for peering was unreasonable.

Defendant argues that Plaintiff does not allege this element because "[t]he only alleged dealing"—the peering arrangement in the Middle East—was never terminated. *See* Dkt. No. 32 at 15–16. Defendant thus casts Plaintiff's argument as a request to expand its prior dealing beyond the Middle East. *Id.* at 16 (citing, *inter alia*, *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1235 (S.D. Cal. 2015)). But this argument defines the "status quo" too narrowly. Certainly, an antitrust plaintiff and defendant must have previously dealt with one another; "unadulterated unilateral conduct—situations in which no course of

dealing ever existed—won't trigger antitrust scrutiny." *Novell v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.). But a course of dealing is not restricted to one discrete act or another; it can include an entity's general practices or terms of doing business. *See, e.g.*, *Qualcomm*, 969 F.3d at 994 (analyzing Qualcomm's "precious practice of licensing at the chip-manufacturer level"). Here, Plaintiff's allegations are sufficient to establish a course of dealing in which Defendant peered with Plaintiff if it met Defendant's guidelines and best practices.

At oral argument, Defendant pointed out that it "receives thousands of requests to peer every year," but "[t]hat doesn't mean that [it] has to accommodate each and every one of those." Dkt. No. 54 at 55:19–20, 23–24; *see also* Dkt. No. 36 at 10. After all, it argued, "the antitrust court is not the regulator of each and every . . . cloud network's connections, bandwidth, investment decisions, and the referee of all its decisions with who to peer with, who not to peer with." *Id.* at 56:5–9. The Court agrees—to a point. The Supreme Court has cautioned that "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S. at 408. But such "administrability concerns" are virtually nonexistent here: Defendant's own prior guidelines and best practices provide "presumably profitable terms already agreed to by the parties" that this Court could use "to fashion a remedial order without having to cook them up on its own." *Novell*, 731 F.3d at 1075. Moreover, as discussed above, a claim based on an alleged refusal to deal requires a "preexisting" course of dealing. *Id.* at 1074. This condition prevents any possible mandate that Defendant peer with anyone who asks, even if it also "risks the possibility that monopolists might be dissuaded from cooperating with rivals even in procompetitive joint venture arrangements—for fear that, once in them, they can never get out." *Id.* That is simply a risk embraced by the refusal-to-deal theory.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### b. *Short-Term Sacrifice of Benefits*

Defendant argues that Plaintiff has not alleged that the only conceivable rationale for its actions was the short-term sacrifice of profits for long-term gain, as Defendant offered Direct Connect—a paid service—and "[s]hifting from a free connection to a paid connection would be *more* profitable to [Defendant]." Dkt. No. 32 at 17. In response, Plaintiff argues that Defendant sacrificed revenue it earned from increased Fortnite usage. *See* Dkt. No. 35 at 19.

The Court finds that Plaintiff does not sufficiently allege that "the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Qualcomm*, 969 F.3d at 993. Plaintiff indeed alleges that Direct Connect was a paid service (*see* Dkt. No. 25 ¶ 84); thus, it would seem Defendant stood to gain from Plaintiff as a paid customer rather than a free peering partner. Plaintiff's cited allegations (*see* Dkt. No. 35 at 19 (citing Dkt. No. 25 ¶¶ 11, 94)) establish only that Plaintiff was competitive with Defendant and that Fortnite traffic was exchanged on Defendant's network.

However, the Court also finds that Plaintiff may be able to cure this deficiency through amendment. Plaintiff argues in its response (as it did at oral argument (*see* Dkt. No. 54 at 36:14–37:2)) that its connections "increased the number of Fortnite players and the number of hours gamers spent playing each week," and that Defendant "earned more revenue with increased usage"; "the loss of that additional revenue was a small price for [Defendant] to pay for the elimination of a rival." Dkt. No. 35 at 19. While these allegations are simply not in the Amended Complaint, they might be added along with other allegations to support this element of the claim. Still, Plaintiff is cautioned—as Defendant argues (*see* Dkt. No. 36 at 9)—that speculative theories of profit sacrifice are insufficient, and the allegations must be sufficient to establish that exclusion was the only conceivable rationale for Defendant's decision.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### c.    *Offering Products to Similarly Situated Customers*

Defendant argues that Plaintiff does not and cannot allege that it refused to provide Plaintiff with a product Defendant provides to similarly situated customers, as Defendant offered Direct Connect, a service that Plaintiff acknowledges is "for connecting to [Defendant] that [Defendant] makes generally available to the marketplace and is used by thousands of customers." Dkt. No. 32 at 17 (citing Dkt. No. 25 ¶¶ 80, 86). In response, Plaintiff argues that Defendant "peered with network optimization firms that did *not* compete with its own services, and allowed settlement-free peering with companies that did not meet its peering standards for symmetrical data transmission." Dkt. No. 35 at 19 (citing Dkt. No. 25 ¶¶ 168–169).

The Court finds that Plaintiff has sufficiently alleged that "the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993. Contrary to Defendant's assertion, the relevant product for Plaintiff's claim is peering, not Direct Connect. Plaintiff alleges that unlike Defendant's commercial counterparts, Defendant refused to peer with entities that offered network optimization services that competed with Defendant's own, but agreed to peer with similar entities that do *not* provide competing network optimization services. *See* Dkt. No. 25 ¶¶ 165–168. Defendant has also peered with companies who are "asymmetrical in their transmission of data . . . even though peering with these companies offer fewer benefits for [Defendant]." *Id.* ¶ 169. For this, Plaintiff alleges, "[t]here is no rational commercial explanation," leaving only "an exclusionary and anticompetitive motive." *Id.* ¶ 170.

### 3.    Antitrust Injury

Defendant argues that Plaintiff fails to allege antitrust injury because it "does not plausibly allege harm to competition as a whole," but rather simply "harm to itself by losing Epic as a customer." Dkt. No. 32 at 18. In response, Plaintiff argues that the Amended Complaint is

1    "replete with such allegations" (Dkt. No. 35 at 20 (citing Dkt. No. 25 ¶¶ 146, 173–176, 179–181,

2    182–185)), namely, that Defendant's actions led to a decreased quality in the relevant markets

3    (*see id.* at 20–21). In reply, Defendant argues that Plaintiff has not plausibly alleged any harm to

4    market-wide quality. *See* Dkt. No. 36 at 10–11.

5        "'Antitrust injury' means 'injury of the type the antitrust laws were intended to prevent

6    and that flows from that which makes defendants' acts unlawful." *Somers*, 729 F.3d at 963

7    (quoting *Brunswick Corp.*, 429 U.S. at 489). Such injury "consists of four elements:

8    '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes

9    the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Id.*

10   (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)).[3]

11   "'[T]o be condemned as exclusionary, a monopolist's act must have an "anticompetitive

12   effect"'—that is, it 'must harm the competitive *process* and thereby harm consumers.'"

13   *Qualcomm*, 969 F.3d at 990 (alteration and emphasis in original) (quoting *United States v.*

14   *Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)). "In contrast, harm to one or more

15   *competitors* will not suffice." *Id.* (emphasis in original) (quoting *Microsoft*, 253 F.3d at 58); *see*

16   *also Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the

17   defendant's conduct harms the plaintiff without adversely affecting competition generally, there

18   is no antitrust injury."); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988) ("The

19   elimination of a single competitor, without more, does not prove anticompetitive effect." (citing

20   *Kaplan*, 611 F.2d at 291)).

21

22

---

23   [3] "In addition, we have imposed a fifth element—that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers*, 729 F.3d at 963 (quoting *Glen*

24   *Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003)). There is no dispute as to this element.

1    Here, the Court finds that Plaintiff has sufficiently alleged antitrust injury—namely, by

2    alleging "decreased quality in the relevant market[s]." *Qualcomm*, 969 F.3d at 989 (quoting *Ohio*

3    *v. Am. Express Co.*, 585 U.S. 529, 542 (2018)). Plaintiff alleges that with the elimination of its

4    "unique" and "industry-leading" services (Dkt. No. 25 ¶ 53), Defendant's customers were

5    "deprived of the *superior* network optimization that [Plaintiff] was able to produce" (*id.* ¶ 183

6    (emphasis added)). Companies that used cloud platforms other than Defendant, and other firms

7    reliant on low-latency connections, were similarly deprived of network optimization "that *only*

8    [Plaintiff] could provide" (*id.* ¶¶ 184–185 (emphasis added)). It also alleges that the quality of

9    the online gaming experience for Epic's customers has decreased. *See id.* ¶ 257. Defendant calls

10    such allegations "conclusory puffery" (Dkt. No. 32 at 19), but even if the allegations are thin, the

11    Court must accept them as true on a motion to dismiss. Taken as true, the allegations establish a

12    decreased quality in the relevant markets.

13    ### 4.    Foreign Trade Antitrust Improvements Act ("FTAIA")

14    Finally, Defendant argues that Plaintiff's antitrust claims fail for the independent reason

15    that "they are based on alleged foreign conduct that does not have the required effect on U.S.

16    commerce." Dkt. No. 32 at 22. In response, Plaintiff argues (1) the FTAIA does not apply

17    because its claims are focused on "domestic anticompetitive conduct by a U.S. company directed

18    at a U.S. firm operating in the U.S. market" (Dkt. No. 35 at 22), and (2) to the extent the FTAIA

19    applies, the required effect on U.S. commerce is sufficiently alleged (*see id.* at 23–26).

20    The FTAIA states that the Sherman Act:

21       shall not apply to conduct involving trade or commerce (other than
          import trade or import commerce) with foreign nations unless—
22
             (1) such conduct has a direct, substantial, and reasonably
23           foreseeable effect—

24

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a. "This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (emphasis in original). "It then brings such conduct back within the Sherman Act's reach provided that the conduct both (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Id.* (emphasis in original) (quoting 15 U.S.C. §§ 6a(1), (2)). The Ninth Circuit has held that "direct effect" means that there must be an "immediate consequence" of the alleged anticompetitive conduct with no "intervening developments." *United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004).

The Court finds that Plaintiff sufficiently alleges domestic conduct, as well as foreign conduct that has a "direct, substantial, and reasonably foreseeable" effect on domestic commerce. 15 U.S.C. § 6a(1). Here, the alleged anticompetitive conduct is Defendant's refusal to peer with Plaintiff. *See supra* Section III.A.2. This refusal to peer included exclusion from U.S.-based peering locations, for which Plaintiff invested in 30 U.S. data centers. *See* Dkt. No. 25 ¶¶ 148, 151–152, 154, 156. The refusal also included exclusion from peering locations abroad. *See id.* ¶¶ 152, 156. But the *effect* of all this conduct (both foreign and domestic) was the

elimination of Plaintiff as a competitor, which resulted in a market-wide decrease in quality in the relevant markets. *See id.* ¶¶ 53, 183–185, 173–185, 254–257. The markets include the United States, as the relevant geographic market is the world. *See id.* ¶¶ 115–117.

The FTAIA may be inapplicable even if both domestic and foreign conduct is alleged. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 962 (N.D. Cal. 2011) (noting allegations that "defendants engaged in anticompetitive conduct both inside and outside the United States" and still finding FTAIA inapplicable). After all, the focus of the analysis is ultimately the location of the *effects*, not the location of the conduct. And contrary to Defendant's assertion at oral argument (*see* Dkt. No. 54 at 17:13–22), Plaintiff's allegations are not reliant on the kind of intervening developments that render its alleged effects speculative. Thus, Defendant's authorities are distinguishable. *See LSL Biotechnologies*, 379 F.3d at 681 (finding alleged "delay of possible 'innovations'" not "direct" because it depends on "uncertain intervening developments"); *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 560 (D. Del. 2006) (finding FTAIA applied where plaintiff's "chain of effects is full of twists and turns, which themselves are contingent upon numerous developments"); *see also McGlinchy*, 845 F.2d at 813 (finding FTAIA applied where plaintiffs pleaded injury only to "customers or potential customers located in Southeast Asia and to plaintiffs themselves"). Plaintiff's theory is simple: the elimination of itself, a unique and industry-leading service, led directly and immediately to a market-wide decrease in quality because no other entity could provide the same services. Whether this theory of antitrust injury (and effect on domestic commerce) bears out in the evidence, of course, is a matter for summary judgment or trial.

*    *    *

1    Therefore, as Plaintiff's Amended Complaint does not sufficiently allege all the elements

2    necessary to establish its Sherman Act claims, Defendant's motion is GRANTED with leave to

3    amend, as discussed above.

4    **B.    Washington Consumer Protection Act ("WCPA")**

5    Plaintiff brings three claims under the WCPA. Two claims are brought under RCW

6    19.86.040. *See* Dkt. No. 25 ¶¶ 215–221 (Count Five: Monopolization of the Market for Low

7    Latency Network Optimization Services on the AWS Network), 222–229 (Count Six: Attempted

8    Monopolization of the Market for Low Latency Optimization Services Within the AWS

9    Network). One claim is brought under RCW 19.86.020. *See* Dkt. No. 25 ¶¶ 259–278 (Count

10    Nine: Unfair Competition).

11    **1.    RCW 19.86.040**

12    RCW 19.86.040 makes it unlawful "for any person to monopolize, or attempt to

13    monopolize or combine or conspire with any other person or persons to monopolize any part of

14    trade or commerce." The statute is "patterned after Sections 1 and 2 of the Sherman Antitrust

15    Act." *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1178 (W.D. Wash. 2021) (citing

16    *State v. Black*, 100 Wn.2d 793, 799, 676 P.2d 963 (1984)). Further, "in construing [the WCPA],

17    the courts [shall] be guided by final decisions of the federal courts and final orders of the federal

18    trade commission interpreting the various federal statutes dealing with the same or similar

19    matters . . . ." RCW 19.86.920.

20    Defendant argues that Plaintiff's WCPA claims fail for the same reasons for which the

21    federal antitrust claims fail. *See* Dkt. No. 32 at 25–27; Dkt. No. 36 at 15–16. Defendant also

22    argues that the WCPA claims fail because Plaintiff has not alleged certain elements unique to the

23    WCPA. *See id.* In its response (and at oral argument), Plaintiff agrees that Counts Five and Six

24

are tied to the federal antitrust claims, but it argues that Count Nine survives under a different

analysis. *See* Dkt. No. 35 at 26–29.

Because the Court has found that Plaintiff's federal antitrust claims fail, *see supra*

Section III.A, the Court also finds that Counts Five and Six also fail, but with leave to amend.

The Court proceeds to analyze Count Nine separately.

### 2.    RCW 19.86.020

RCW 19.86.020 makes unlawful "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce." To plead a claim under this

statute, a plaintiff must allege "(1) an unfair or deceptive act or practice, (2) occurring in trade or

commerce, (3) affecting the public interest, (4) injury to a person's business or property, and

(5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (citing

*Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)).

Defendant argues that Plaintiff alleges neither an unfair or deceptive act or practice, nor

that such act or practice affects the public interest. *See* Dkt. No. 32 at 26; Dkt. No. 36 at 15–16.

Specifically, Defendant argues that the alleged conduct applies only to the Parties here, not to the

general public, thus failing to meet either element. *Id.* Plaintiff responds that it alleges both

unfair and deceptive conduct, as well as how that conduct caused larger injury to Epic, Fortnite

players, actual and potential customers of Plaintiff, and other network optimization companies.

*See* Dkt. No. 35 at 28–29.

"A private plaintiff must show that his lawsuit would serve the public interest." *Michael*

*v. Mosquera-Lacy*, 165 Wn.2d 595, 605, 200 P.3d 695 (2009) (citing *Lightfoot v. MacDonald*, 86

Wn.2d 331, 544 P.2d 88 (1976)). "For private disputes, 'it may be more difficult to show that the

public has an interest in the subject matter.'" *Id.* (quoting *Hangman Ridge*, 105 Wn.2d at 790).

"Whether the public has an interest in any given action is determined by reference to several

factors, depending on the context in which the alleged acts were committed." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744, 935 P.2d 628 (1997) (citing *Hangman Ridge*, 105 Wn.2d at 789–90). "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." *Hangman Ridge*, 105 Wn.2d at 790. "[T]here must be shown a real and substantial potential for repetition, as opposed to a hypothetical possibility of an isolated unfair or deceptive act's being repeated." *Michael*, 165 Wn.2d at 604–05 (quoting *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 52, 686 P.2d 465 (1984)). In private disputes, a court evaluates four factors to determine if the dispute affects the public interest: "(1) whether the alleged acts were committed in the course of defendant's business; (2) whether the defendant advertised to the public in general; (3) whether the defendant actively solicited this particular plaintiff, indicating potential solicitation of others; and (4) whether the plaintiff and defendant have unequal bargaining positions." *Id.* at 605 (citing *Hangman Ridge*, 105 Wn.2d at 791). "None of the factors are dispositive nor must all of the factors be present." *Id.*

Here, the Court finds that Plaintiff has not alleged that Defendant's alleged conduct affects the public interest. While Defendant allegedly acted in the course of its business, there are no allegations that Defendant advertised to the public in general or actively solicited Plaintiff (as opposed to Plaintiff's initiating contact with Defendant). *See Michael*, 165 Wn.2d at 605 (finding no showing that lawsuit would serve the public interest where business did not advertise to public in general or solicit plaintiff in particular). As in *Goodyear*, "[Defendant's] conduct was not directed at the public," and "[Defendant] committed the allegedly unfair and deceptive acts in the course of its business dealings with [Plaintiff]." 86 Wn. App. at 744, 745; *see also id.* at 744 ("[Goodyear's] competition with dealers and the tactics it used to secure dealership expansions had no deceptive capacity affecting the public in general."); *Evergreen Moneysource*

*Mortg. Co. v. Shannon*, 167 Wn. App. 242, 261, 274 P.3d 375 (2012) ("Significantly, conduct that is not directed at the public, but, rather, at a competitor, lacks the capacity to impact the public in general."); *Hangman Ridge*, 105 Wn.2d at 794 ("The context in which these acts occurred was that of an essentially private transaction . . . rather than a consumer transaction."); *cf. Fifteen Twenty-One Second Ave. Condo. Ass'n v. Viracon, LLC*, No. C23-1999, 2024 WL 4144160, at *5 (W.D. Wash. Sept. 11, 2024) ("The purpose of the CPA is not to remedy parties to an entirely private dispute, but to protect the public more generally.").

Further, Plaintiff—a sophisticated business and, by its own allegations, a successful one that posed a competitive threat to Defendant (*see* Dkt. No. 25 ¶¶ 52–63)—is "not representative of bargainers vulnerable to exploitation." *Goodyear*, 86 Wn. App. at 745; *see also Hangman Ridge*, 105 Wn.2d at 794 (holding plaintiffs—who had a history of business experience and retained an attorney and an accountant on a regular basis—"not representative of bargainers subject to exploitation and unable to protect themselves"); *Zunum Aero, Inc. v. Boeing Co.*, No. C21-896, 2022 WL 2342891, at *3 (W.D. Wash. June 29, 2022) (observing that "cases involving two business entities" are generally treated as involving parties who are not representative bargainers). Ultimately, while Plaintiff alleges that Defendant's conduct affected other parties beyond the Parties to this matter (*see* Dkt. No. 25 ¶¶ 182–192), it does not allege a "real and substantial potential for repetition" of that conduct with other entities.[4]

\* \* \*

Therefore, as to Plaintiff's WCPA claims, Defendant's motion is GRANTED as to Counts Five and Six with leave to amend and GRANTED as to Count Nine without leave to amend, as amendment would be futile.

---

[4] Because the Court finds that Plaintiff's claim fails on this element, it need not reach Defendant's arguments regarding "unfair or deceptive" conduct.

**C.      Federal Communications Act**

Plaintiff brings one claim for violation of the Communications Act. *See* Dkt. No. 25 ¶¶ 240–258 (Count Eight). The relevant provision states: "All charges, practices, classifications, and regulations for and in connection with such communication service,[5] shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b); *see also* 47 U.S.C. § 207 (authorizing damages suit for violation of Section 201(b)).[6]

Defendant argues that under a rule of the Federal Communications Commission ("FCC") that was in effect at the time of relevant conduct, Defendant's peering services were classified as "information services," not telecommunications services, and thus were not subject to the Act. *See* Dkt. No. 32 at 27; Dkt. No. 36 at 16–17; *see also* Restoring Internet Freedom ("RIF"), 33 FCC Rcd. 311 (2018). In response, Plaintiff argues that whether Defendant's services were subject to the Act is a factual determination, that the 2018 FCC rule was later vacated, and that more recent FCC activity suggests that Defendant's services are indeed subject to the Act. *See* Dkt. No. 35 at 30–33; *see also* Safeguarding and Securing the Open Internet, 89 Fed. Reg. 45404 (2024).[7]

---

[5] "It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor . . . ." 47 U.S.C. § 201(a).

[6] A "telecommunications carrier" is "any provider of telecommunications services." 47 U.S.C. § 153(51). A telecommunications carrier is "treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services." *Id.* A "telecommunications service" is "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53). "Telecommunications" means "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50).

[7] The conflicting FCC orders "represent yet another iteration of a long-running debate regarding the regulation of the Internet." *Mozilla Corp. v Fed. Comm'cns Comm.*, 940 F.3d 1, 17 (D.C. Cir. 2019). Indeed, that debate continues apace: in August 2024, the Sixth Circuit imposed a stay on the 2024 FCC order pending review of a challenge to the order, holding that "[n]et neutrality is likely a major question requiring clear congressional authorization." *In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *3 (6th Cir. Aug. 1, 2024).

1    Here, the Court agrees that the 2018 FCC rule squarely forecloses Plaintiff's claim. The

2  rule puts it plainly: "We make clear that as a result of our decision to restore the longstanding

3  classification of broadband internet access service as an information service, internet traffic

4  exchange arrangements are no longer subject to Title II and its attendant obligations." RIF ¶ 144.

5  Plaintiff correctly observes that the rule was later vacated, but the fact remains that the 2018 rule

6  was the rule in effect at the time of Defendant's alleged anticompetitive conduct in 2020–2022,

7  and there is no authority for applying the 2024 rule retroactively to this matter. The Court finds

8  no reason to disturb the reasoned conclusion of the FCC at the time of the alleged conduct in this

9  matter, particularly given that Defendant was not on notice of a different interpretation.

10    Therefore, as to Plaintiff's Communications Act claim, Defendant's motion is GRANTED

11  without leave to amend, as amendment would be futile.

12  **D.    Tortious Interference with Contractual Relations**

13    Finally, Plaintiff brings a claim for tortious interference. *See* Dkt. No. 25 ¶¶ 230–239. A

14  claim of tortious interference requires five elements: "(1) the existence of a valid contractual

15  relationship or business expectancy; (2) that defendants had knowledge of that relationship;

16  (3) an intentional interference inducing or causing a breach or termination of the relationship or

17  expectancy; (4) that defendants interfered for an improper purpose or used improper means; and

18  (5) resultant damage." *Moore v. Com. Aircraft Interiors, LLC*, 168 Wn. App. 502, 508–09, 278

19  P.3d 197 (2012) (quoting *Leingang v. Pierce Cnty. Med Bureau, Inc.*, 131 Wn.2d 133, 157, 930

20  P.2d 288 (1997)). While "the 'improper means' prong of the fourth element requires a violation

21  of a 'statute, regulation, common law rule, or professional standard,' the 'improper purpose'

22  prong bears no such requirement." *United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d

23  1084, 1099 (W.D. Wash. 2022) (citing *Pleas v. City of Seattle*, 112 Wn.2d 794, 774 P.2d 1158,

24

1163 (1989)). Improper purpose can include "acting out of ill will, greed, retaliation, or hostility" or being "motivated by an intent to harm the plaintiff." *Moore*, 168 Wn. App. at 509.

Defendant argues that the claim fails because the only potential wrongful acts are violations of the Sherman Act or Communications Act, which it argues are not wrongful.[8] *See* Dkt. No. 32 at 27; Dkt. No. 36 at 16. In response, Plaintiff argues that it has alleged wrongful acts, and points out that "an interference claim alleging an improper purpose does not require an independently wrongful act." *See* Dkt. No. 35 at 29–30. As the Court has found that Plaintiff's Sherman Act, WCPA, and Communications Act claims fail, the Court agrees that Plaintiff has thus not alleged use of "improper means," as there is no alleged wrongful act. However, Plaintiff may still correct the deficiencies of its antitrust claims with amendment, which may then establish a wrongful act.

As to "interfer[ence] for an improper purpose," the analysis is more complicated. Plaintiff's cited allegations are to its antitrust claims that Defendant engaged in anticompetitive conduct designed to harm Plaintiff. *See* Dkt. No. 25 ¶¶ 7, 70–73, 98–101, 107–109, 124–125. Plaintiff provides no authority that competitive, even ruthless, conduct is "improper," even if it succeeds in eliminating a rival, and as discussed above, *see supra* Section III.A, Plaintiff's antitrust claims fail.

Still, in its response, Plaintiff now asserts that Defendant "retailat[ed] against [Plaintiff] for embarrassing [Defendant] in the Mideast for succeeding in providing Epic with low-latency connectivity when [Defendant] failed." Dkt. No. 35 at 30. This allegation is not found in the Amended Complaint, and contrary to Plaintiff's assertion at oral argument, it cannot simply be

---

[8] At oral argument, Defendant appeared to argue that Plaintiff did not allege a valid contractual relationship or business expectancy. However, because Defendant did not raise this issue in its motion (and Plaintiff did not raise it in its response), the argument is waived for this motion and the Court will not consider it.

"reasonably implied" from the entirety of the complaint. However, the Court will grant Plaintiff leave to amend this claim to allege this purpose and any supporting allegations. Plaintiff is cautioned that "merely labeling" Defendant's actions as retaliation may not meet Plaintiff's burden of showing improper purpose. *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 169, 273 P.3d 965 (2012).

Therefore, as to Plaintiff's claim for tortious interference, Defendant's motion is GRANTED with leave to amend.

## IV.    CONCLUSION

Accordingly, Defendant's Motion to Dismiss Amended Complaint Under Rule 12(b)(6) (Dkt. No. 32) is GRANTED with limited leave to amend. It is hereby ORDERED:

- Counts One, Two, Three, and Four (Sherman Act) are DISMISSED with leave to amend.

- Counts Five and Six (WCPA antitrust) are DISMISSED with leave to amend.

- Count Seven (tortious interference) is DISMISSED with leave to amend.

- Count Eight (Communications Act) is DISMISSED without leave to amend.

- Count Nine (WCPA unfair competition) is DISMISSED without leave to amend.

Should Plaintiff choose to amend, the Second Amended Complaint SHALL be filed **within thirty (30) days** of this Order.

Dated this 23rd day of December 2024.

Tana Lin
United States District Judge