1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11  SUBSPACE OMEGA, LLC,                    CASE NO. 2:23-cv-01772-TL

12                     Plaintiff,           ORDER ON MOTION TO DISMISS
              v.

13
    AMAZON WEB SERVICES, INC.,

14
                       Defendant.

15

16

17         This is an antitrust action brought pursuant to the Sherman Act, Clayton Act, Washington

18  Consumer Protection Act ("WCPA"), and common-law tort. Plaintiff Subspace omega, LLC,

19  seeks damages and injunctive relief for the alleged monopolization and/or attempted

20  monopolization of markets related to internet data-connection services, as well as further

21  damages for tortious interference with a business expectancy. This matter is before the Court on

22  Defendant Amazon Web Services, Inc.'s ("AWS") Motion to Dismiss Second Amended

23  Complaint Under Rule 12(b)(6). Dkt. No. 59. Having reviewed the motion, Plaintiff's response

24

(Dkt. No. 60), Defendant's reply (Dkt. No. 62), and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS the motion IN PART and DENIES the motion IN PART.

## I.    BACKGROUND[1]

The following allegations are recited as pleaded in the Second Amended Complaint ("SAC"). *See* Dkt. No. 57.

### A.    The Internet and Peering

The internet is a global system of interconnected computer networks that exchange data with one another. *Id.* ¶ 19. Two networks can connect with each other in two primary ways: (1) "peering," which denotes a direct connection between two networks; or (2) "transit," which provides access to any destination network using any available routing paths, including those of third parties. *Id.* ¶¶ 21–23.

Network "latency," or "lag," measures the time it takes for data transmitted over the internet to reach its destination following the instruction of its transfer by a user. *Id.* ¶ 25. "Low latency" means faster network communication and a better user experience; "high latency" means slower transmission. *Id.* ¶¶ 25–27. "Network optimization" is an iterative process that seeks to improve network performance and reliability through various means, including managing network traffic volume and latency, controlling traffic direction, and band steering (i.e., the automatic assignment of a Wi-Fi client to the optimal wireless network). *Id.* ¶ 31.

Peering generally reduces latency and results in an improved user experience. *See id.* ¶¶ 35–39, 41, 43–44. Parties will typically enter a "settlement-free" (i.e., no charge) peering agreement when they have "similar profiles" and the information exchanged between them is

---

[1] This Section is largely reproduced from the Background Section in the Court's December 23, 2024, Order on Defendant's first motion to dismiss. *See* Dkt. No. 55 (Order on Motion to Dismiss) at 2–7. The Court has updated the citations to reflect the allegations in Plaintiff's Second Amended Complaint ("SAC") (Dkt. No. 57).

balanced. *Id.* ¶ 40. Where there is significant asymmetry in volumes of data, peering is typically

paid for and formal agreements are negotiated. *Id.* ¶ 42.

**B.    The Parties**

Plaintiff Subspace omega LLC, founded in 2017, was a provider of network optimization

services. *Id.* ¶¶ 52–53. Plaintiff provided its services using over 136 "Internet Exchange Points"

("IX" or "IXP") (i.e., geographic locations where internet traffic is exchanged) and settlement-

free peering arrangements with major network providers. *Id.* ¶¶ 46, 55–57. Plaintiff focused on

increasing its IX participation to reduce latency, and it offered real-time dynamic protection

against distributed denial-of-service attacks (which bombard a website with fraudulent requests

with the intention of disabling it from responding to legitimate requests) using a proprietary

method that did not add latency. *Id.* ¶¶ 58–59. Plaintiff's servicers were used by low-latency-

dependent applications like VoIP (Voice Over Internet Protocol) and video streaming. *Id.* ¶ 61.

Plaintiff's services depended upon settlement-free peering. *Id.* ¶ 62.

Defendant Amazon Web Services, Inc., is the largest cloud computing and hosting

services company in the world. *Id.* ¶ 78. Defendant offers its services as part of its "Infrastructure

as a Service" ("IaaS") product. *Id.* In 2022, Defendant held 40 percent of the global IaaS cloud

computing market. *Id.* ¶ 79.

Once a content provider selects a cloud computing and hosting provider, all data traffic

must be transmitted via that network. *Id.* ¶ 94. To that end, Defendant offers three means of

network interconnection: (1) public peering, (2) private peering, and (3) a service called "Direct

Connect." *Id.* ¶ 80. Public or private peering involves direct routes to and from Defendant's

network. *Id.* ¶ 81. Public peering occurs through Defendant's 160 public IXPs. *Id.* ¶ 82. Private

peering is direct connection with Defendant's network without an interconnecting IXP router. *Id.*

¶ 83. Direct Connect is not a peering service but is instead a paid proprietary product that

facilitates the exchange of internet traffic between customers and Defendant. *Id.* ¶¶ 84, 86. Prior to 2022, Defendant had peering standards that permitted service providers that met certain technical guidelines to peer with Defendant's network on a settlement-free basis. *Id.* ¶¶ 85, 166. At all relevant times, Plaintiff met the technical guidelines. *Id.* ¶ 167. Defendant also had established peering "best practices," which Plaintiff also satisfied. *Id.* ¶ 168. In early 2022, after Plaintiff complained to Defendant about Defendant's conduct, Defendant amended its peering policy to include a mention of Direct Connect. *Id.* ¶ 86.

Defendant also offers products that compete directly with network optimization service providers like Plaintiff. *Id.* ¶ 92. These products include Global Accelerator, which Defendant describes as a networking service that helps improve network performance of public applications. *Id.* Defendant recommends this product for use with "[l]ow latency gaming," claiming that it provides "custom routing to deterministically route traffic." *Id.* These products also included Cloud WAN, released in late 2021, which is a vertically integrated product that similarly offered network optimization services to Defendant's network users. *Id.*

**C.    Plaintiff's Deal with Epic Games and Initial Cooperation with Defendant**

During the time period relevant to this case, Plaintiff's largest customer was Epic Games ("Epic"), one of the world's largest and most successful video game and software developers and publishers. *Id.* ¶¶ 60, 64. Epic is the developer and publisher of "Fortnite," a competitive multiplayer online game with nearly half a billion players globally. *Id.* ¶ 64. Fortnite requires low-latency connections, as a player's in-game actions can be negated or improved by the speed of their connection. *Id.* ¶ 67.

Since at least 2018, Epic operated Fortnite using Defendant's network. *Id.* ¶ 65. However, in advance of a major marketing event in August 2019 requiring enhanced connections in the Middle East, it became clear that Defendant would not have the infrastructure in place to support

1    Epic's needs. *Id.* ¶¶ 69–71. Thus, on June 21, 2019, Plaintiff and Epic entered a Platform Access

2    Agreement by which Plaintiff would provide network optimization services. *Id.* ¶ 68. As part of

3    its services to Epic, Plaintiff requested peering with Defendant at certain locations, including

4    Mumbai, India; Dubai and Fujairah City in the United Arab Emirates; and Bahrain. *Id.* ¶ 134.

5    Defendant acceded to the request, and by July 2019, the peering was established. *Id.* ¶ 135.

6        Epic was so satisfied with Plaintiff's services that it considered expanding its business

7    relationship with Plaintiff. *Id.* ¶ 136. In January 2020, in furtherance of that anticipated

8    expansion, Plaintiff asked Defendant for additional peering in Frankfurt, Germany. *Id.* ¶ 137.

9    Epic confirmed that request to Defendant directly on February 7, 2020, asking Defendant to

10   "work with Subspace to establish the peering relationships they've mentioned." *Id.* Defendant

11   initially indicated that it would accede to Plaintiff's request and establish the additional peering.

12   *Id.* ¶ 138. In February 2020, Defendant, Epic, and Plaintiff engaged in a series of

13   communications to work out the logistics. *Id.*

14   **D.    Defendant's Alleged Anticompetitive Behavior**

15       On March 17, 2020, Defendant told Plaintiff that it had decided not to move forward with

16   peering in Frankfurt and suggested an arrangement using its Direct Connect product instead. *Id.*

17   ¶ 139. That decision was made by Rob Kennedy, Defendant's then-Director of Global Network

18   Connectivity. *Id.* ¶ 140. Defendant continued to allow peering with other entities that, unlike

19   Plaintiff, did not offer competitive network optimization services. *Id.* ¶ 142.

20       Plaintiff attempted to work with Defendant to test whether Direct Connect would meet

21   Plaintiff's needs. *Id.* ¶ 143–145. During these attempts, however, Plaintiff noticed a material

22   deterioration in the quality of its services, as well as numerous technical and overbilling

23   problems. *Id.* ¶¶ 146–147. Plaintiff raised these problems with Defendant on multiple occasions,

24   but despite some conversations, the problems continued. *Id.* ¶¶ 148–153. The problems persisted

for over a year, leading Plaintiff to conclude that Direct Connect was not a viable alternative to peering. *Id.* ¶ 154.

In early November 2021, Defendant suggested that it would be willing to again discuss potential peering arrangements with Plaintiff. *Id.* ¶ 155. Plaintiff responded with four peering requests on November 4, 2021, covering various IXPs in Asia and Australia, India, Europe and Africa, and North America. *Id.* ¶ 156. When Defendant did not respond for over a week, Plaintiff sent Defendant a Notice of Anticompetitive Behavior, including a stated intention to file a complaint with the Federal Trade Commission if Defendant did not respond within seven days. *Id.* ¶¶ 157–158. After the Notice was sent, Defendant sent Plaintiff requests for peering at two IXPs in Los Angeles, California, and Denver, Colorado. *Id.* ¶ 159. Plaintiff made technical preparations for those connections and made additional peering requests for 10 other sites, to which Defendant was "receptive." *Id.* ¶¶ 159–160. On November 17, 2021, Plaintiff and Defendant spoke about the Notice and the peering requests, and Plaintiff followed up later to encourage further discussion. *Id.* ¶ 153.

However, in an email on November 18, 2021, Defendant stated that it agreed to peering in certain locations but "pressured Subspace to shift public peering to Direct Connect connections if traffic levels exceeded a certain threshold." *Id.* ¶ 162. Defendant "even attempted to force Subspace to terminate already-established private peering sessions at certain Middle East and India locations altogether, replacing them with Direct Connect connections if traffic exceeded a certain threshold and with public peering if traffic fell below that threshold." *Id.* Plaintiff thus concluded that Defendant had no intention of peering, and on November 22, 2021, Plaintiff told Defendant that it was engaged in anticompetitive behavior. *Id.* ¶ 163. Based on Defendant's suggestion of expanded peering, Plaintiff had invested in 30 data centers in Europe and an equal number in the United States. *Id.* ¶ 164.

In February 2022, Plaintiff was forced to terminate its contract with Epic "due to the degradation of its service that [Defendant] had caused by refusing to peer." *Id.* ¶ 195. On May 31, 2022, Plaintiff was forced to cease operations "as a direct result of [Defendant's] refusal to continue to support peering with Subspace." *Id.* ¶ 196. After Plaintiff went out of business, Defendant took Plaintiff's place in providing network optimization services to Epic. *Id.* ¶ 197.

**E.    The Alleged Markets**

Plaintiff alleges two relevant markets for its monopolization claims. *See id.* ¶¶ 96–123. First, Plaintiff alleges the "cloud computing" market, in which Defendant has "at least" a 40 percent market share and a "dangerous probability" of gaining a 60–70 percent share "in the near future." *Id.* ¶ 98. Between 2020 and 2023, Defendant doubled its revenue from $45.3 billion to $90.8 billion, and it recently announced its intention to invest $148 billion "to increase its footprint in the market." *Id.* ¶¶ 99–100.

Second, Plaintiff alleges the "low latency network optimization on AWS" market, in which Defendant has at least a 60 percent share. *Id.* ¶ 111. Defendant attempts to force customers to use its products, like Global Accelerator and Cloud WAN, which are of lower-quality than comparable products offered by Defendant's competitors. *Id.* ¶ 116. Because of the costs of switching from Defendant to another provider, Defendant can force its users to use its inferior products without fear of losing the user. *Id.* ¶ 118.

The geographical scope for all these markets is the world. *Id.* ¶¶ 124–126.

**F.    Procedural History**

On November 18, 2023, Plaintiff filed its initial Complaint and commenced this action. Dkt. No. 1. On April 29, 2024, Plaintiff filed its First Amended Complaint ("FAC"). Dkt. No. 25. On June 3, 2024, Defendant moved to dismiss the FAC. Dkt. No. 32. On December 23, 2024, the Court granted Defendants' motion to dismiss but allowed Plaintiff "limited leave to

amend." Dkt. No. 55 at 32. On January 21, 2025, Plaintiff filed its SAC. Dkt. No. 57. On February 28, 2025, Defendant moved to dismiss the SAC. Dkt. No. 59.

## II.     LEGAL STANDARD

A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. When considering a motion to dismiss brought under Rule 12(b)(6), the Court "accept[s] as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

## III.     DISCUSSION

### A.     Differences Between the SAC and FAC

The SAC represents a new pleading, and the Court treats it as such. *See Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (discussing Ninth Circuit precedent regarding one pleading's superseding another). Still, "[r]ather than repeating the analysis from the Court's prior order [i.e., Docket No. 55], the Court addresses only the new allegations in the [Second] Amended Complaint and [Plaintiff's] new arguments in support of

1    [its] claims." *Eisner v. Meta Platforms, Inc.*, No. C24-2175, 2024 WL 4545968, at *1 (N.D. Cal.

2    Oct. 22, 2024).

3            The SAC pleads six causes of action; the FAC pleaded nine. In granting Defendant's

4    motion to dismiss, the Court dismissed two of Plaintiff's claims with prejudice. *See* Dkt. No. 55

5    at 32. Accordingly, the SAC omits claims for violation(s) of the Federal Communications Act

6    (*see* Dkt. No. 25 ¶¶ 240–258) and unfair-competition violations of the WCPA (*see id.*

7    ¶¶ 259–278). Further, where the FAC alleged three relevant product markets (*see id.* ¶¶ 96–114),

8    the SAC only alleges two relevant product markets (*see* Dkt. No. 57 ¶¶ 96–123). In its prior

9    Order, the Court "f[ound] that the 'AWS Network' [was] not a properly defined relevant market"

10   (Dkt. No. 55 at 11), and Plaintiff no longer alleges that the "AWS Network" is a relevant product

11   market. Accordingly, Plaintiff no longer alleges monopolization of the AWS Network Market.

12   *See* Dkt. No. 25 ¶¶ 193–199.

13           In dismissing the FAC, the Court alerted Plaintiff to various holes in its pleading.

14   Relevant here, the Court identified fundamental deficiencies that it deemed curable. With respect

15   to defining the relevant market, the Court found that Plaintiff had not adequately alleged the four

16   necessary elements required to establish a single-brand aftermarket for low-latency network

17   optimization on AWS. *See* Dkt. No. 55 at 12. As to Plaintiff's allegations regarding attempted

18   monopolization of the cloud-computing market, the Court found that Plaintiff had not

19   sufficiently alleged that there was a "dangerous probability" that "Defendant will achieve

20   monopoly power in the cloud computing market . . . ." *Id.* at 13. Further, Plaintiff did not

21   sufficiently allege that "the only conceivable rationale or purpose [for Defendant's actions] is to

22   sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of

23   competition," an element of the refusal-to-deal theory of anticompetitive conduct upon which

24   Plaintiff had predicated its case of attempted monopolization of the cloud-computing market. *Id.*

at 19 (quoting *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020)). As to Plaintiff's state-law claim of tortious interference, the Court found that Plaintiff had not sufficiently alleged an "improper purpose" behind Defendant's alleged tortious interference with Plaintiff's contractual relationship (or business expectancy) with Epic Games. *Id.* at 31–32. Where the Court pointed out these holes and, accordingly, dismissed the relevant insufficient claims, the Court provided Plaintiff leave to amend in an SAC.

Plaintiff has done so. In addition to the more structural amendments discussed above, the SAC includes some 41 new paragraphs of allegations, several minor changes to existing allegations, and several instances of reorganization. *See* Dkt. No. 57 ¶¶ 96, 101–106, 112–115, 119–122, 129, 131, 142, 181–190, 200, 201, 213, 223, 244, 246–247, 250–255, 257–260, 264, 266–269. This Order considers whether these amendments and "new allegations . . . move the needle enough to state a claim." *Eisner*, 2024 WL 4545968, at *2.

In sum, the SAC pleads six claims: (1) federal-law attempted monopolization of the cloud-computing market (Dkt. No. 57 ¶¶ 212–217); (2) federal-law monopolization of the market for low-latency network optimization services on AWS (*id.* ¶¶ 218–224); (3) federal-law attempt to monopolize the market for low-latency network optimization services on the AWS network (*id.* ¶¶ 225–228); (4) state-law monopolization of the market for low-latency network optimization services on the AWS network (*id.* ¶¶ 229–235); (5) state-law attempted monopolization of the market for low-latency network optimization services within the AWS network (*id.* ¶¶ 236–244); and (6) state-law tortious interference with business expectancy and contractual relations (*id.* ¶¶ 245–269).

//

//

//

1    **B.    Antitrust Claims (Claims One, Two, Three, Four, and Five)**

2        **1.    Threshold Issue: Defining the Relevant Market**

3        "A threshold step in any antitrust case is to accurately define the relevant market."

4    *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) (quoting *Qualcomm Inc.*, 969

5    F.3d at 992. "[A] relevant market defines 'the field in which meaningful competition is said to

6    exist.'" *Id.* (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th

7    Cir. 1997)). "'The principal most fundamental to product market definition is cross-elasticity of

8    demand for certain products or services,'" which refers to "the extent to which consumers view

9    two 'products as being reasonably interchangeable' or substitutable for one another." *Id.* (citation

10   modified) (first quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979); then

11   quoting *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th

12   Cir. 2013)). "Cross-elasticity of demand measures the suitability of two products by determining

13   whether consumers will shift from one product to another in response to changes in the relative

14   costs of the two products." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 123 (C.D. Cal.

15   2007). "A relevant market contains both a geographic component and a product or service

16   component." *Coronavirus Rep.*, 85 F.4th at 955 (quoting *Epic Games, Inc. v. Apple, Inc.*, 67

17   F.4th 946, 975 (9th Cir. 2023)). "Courts also consider the practical indicia of a market, including

18   industrial or public recognition of a market as a separate entity or sensitivity to price changes."

19   *Id.* (citation modified) (quoting *Epic Games*, 67 F.4th at 976).

20       Plaintiff alleges two relevant markets: "(i) the market for cloud computing, and (ii) the

21   market for low latency network optimization services on AWS." Dkt. No. 57 ¶ 96. The first

22   relates to Count One, and the second relates to Counts Two through Five. As to the first relevant

23   market, Defendant does not meaningfully challenge Plaintiff's definition of the cloud-computing

24   market. The Court construes this as a concession that Plaintiff has met the threshold step of

defining that relevant market. *See Rintoul v. Old Dominion Freight Line, Inc.*, No. C21-1733, 2024 WL 2974469, at *2 (D. Or. June 13, 2024) ("Generally, the failure to respond to an argument on its merits is grounds for deeming that argument abandoned or conceded.") (citing *Ramirez v. Ghilotti Bros.*, 941 F. Supp. 2d 1197, 1210 & n.7 (N.D. Cal. 2013) (collecting cases)).

As to the second relevant market, the Court found in its prior Order that "low latency network optimization on AWS" may be a relevant market—namely, a single-brand aftermarket derivative of Defendant's network." Dkt. No. 55 at 12. But the Court also stated that, "while Plaintiff's allegations address (to some degree) the existence of switching costs, they do not appear to address the other elements required of a single-brand aftermarket, such as consumer knowledge of restrictions at the time of foremarket purchase, or information costs." *Id.* (citing *Epic Games*, 67 F.4th at 977). The Court gave Plaintiff leave to amend its allegations as to this alleged market. *See id.* Defendant asserts that these deficiencies persist in the SAC. *See* Dkt. No. 59 at 21–28.

"[T]o establish a single-brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games*, 67 F.4th at 977. The Court found that Plaintiff had adequately pleaded the third element in the FAC but had not sufficiently alleged the first, second, or fourth. *See* Dkt. No. 55 at 12. The SAC adds eight new paragraphs to its allegations regarding the market for low-latency network optimization on AWS. *See* Dkt. No. 57 ¶¶ 112–115, 119–122. The Court will address the elements that these eight paragraphs purport to satisfy.

1

(1)     Aftermarket Restrictions "Not Generally Known"

2     Defendant argues that the inquiry into consumer knowledge is an inquiry into what Epic

3     Games—i.e., the "customer" that chose the AWS network to host its game(s)—knew when it

4     made that choice. *See* Dkt. No. 59 at 25. "In other words," Defendant asserts, "Subspace must

5     allege that Epic Games initially chose the AWS Network 'foremarket' believing AWS would not

6     control which companies could offer network optimization through peering." *Id.* Defendant

7     argues that the SAC fails to do so. *See id.*

8     The Court agrees with Defendant's framing of the issue. But the Court disagrees with

9     Defendant's assertion that Plaintiff has not met this burden. Plaintiff alleges in the SAC that "[i]t

10    is a normal and standard industry practice for all cloud service providers, including AWS, to peer

11    with other networks on a settlement-free basis." Dkt. No. 57 ¶ 119. On a motion to dismiss, the

12    Court draws all reasonable inferences in Plaintiff's favor. *See Curtis v. Inslee*, 154 F.4th 678, 695

13    (9th Cir. 2025). Here, it is certainly reasonable to infer that Epic Games, "one of the world's

14    largest and most successful video game and software developers and publishers (Dkt. No. 57

15    ¶ 64), would be cognizant of the "normal and standard industry practice" of cloud service

16    providers—namely, settlement-free peering. Defendant attempts to shut down this line of

17    reasoning by arguing that Plaintiff "alleges facts that plausibly allow only one conclusion: Epic

18    was well aware that AWS reserved the right to determine when, where, and with whom to peer."

19    Dkt. No. 59 at 26. But while this characterization of Defendant's reservation of rights may be

20    true, Defendant's argument merely pits Epic's understanding of "normal and standard industry

21    practice" against Epic's knowledge that Defendant could determine "when, where, and with

22    whom to peer." Put differently, did Epic think Defendant was more likely to follow normal and

23    standard industry practice; or did Epic think Defendant was more likely to do what it wanted,

24    irrespective of the standard? Plaintiff does not allege the specific calculus that Epic applied when

1    it endeavored to answer this question and assess which of these factors—standard industry

2    practice or Defendant's whim—would be more indicative than the other of Defendant's conduct

3    with respect to settlement-free peering. But Plaintiff does not need to do so. The ultimate truth of

4    what Epic believed is a question to be resolved at trial or on summary judgment, not here. Based

5    on the as-pleaded allegations in the SAC, it is reasonable to conclude at the motion-to-dismiss

6    stage that Epic was unaware that Defendant would diverge from "normal and standard industry

7    practice."

8                              (2)    Accurate Life-Cycle Pricing

9           The SAC is generally silent on this factor, that is, whether significant information costs

10   prevent accurate life-cycle pricing. With respect to "complex, durable equipment"—which

11   cloud-computing services are decidedly not—"[l]ifecycle pricing . . . is difficult and costly."

12   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473 (1992).

13                  In order to arrive at an accurate price, a consumer must acquire a
                    substantial amount of raw data and undertake sophisticated
14                  analysis. The necessary information would include data on price,
                    quality, and availability of products needed to operate, upgrade, or
15                  enhance the initial equipment, as well as service and repair costs,
                    including estimates of breakdown frequency, nature of
16                  repairs, price of service and parts, length of "downtime," and
                    losses incurred from downtime.
17

18   *Id.* The FAC included precious little factual allegation regarding what essentially amounts to the

19   price of doing cloud-computing business with Defendant (*see* Dkt. No. 25 ¶¶ 110–114), and the

20   SAC is no different (*see* Dkt. No. 57 ¶¶ 103–110). The Court finds it significant that, in framing

21   the issue, the Supreme Court used the specific term "pricing." *Eastman Kodak*, 504 U.S. at 473.

22   *Pricing* suggests a particular consideration of dollars and cents, as opposed to more generalized

23   burdens—administrative and logistical, for example—that might be associated with a more

24   generic term. The Supreme Court's suggestion of various line items—e.g., service and repair

costs, price of service and parts, losses incurred from downtime—further indicates that this is meant to be a quantitative, rather than qualitative, analysis. In contrast, Plaintiff's allegations tend to focus on the fuzzier concept of *burden*, asserting that doing business with Defendant necessarily entangles or, to use Plaintiff's term, "enmesh[es]," a customer within Defendant's ecosystem. For example, Plaintiff alleges that "AWS's dominance is further enhanced by its many ancillary services it provides to cloud customers. These services are intended to enmesh the customer on the AWS cloud and make it extremely difficult, if not impossible, for a customer to exit the AWS cloud." *Id.* ¶ 105. But is such enmeshment expensive? Or, more to the point, how does such enmeshment make it difficult to ascertain the price of using Defendant as a cloud-computing provider?[2] Plaintiff includes allegations as to the cost of *switching* from Defendant to an alternative provider (*see, e.g.*, *id.* ¶ 118)—these satisfy the *third* element needed to establish a single-brand aftermarket—but they do not address the price of *staying*, an essential ingredient of lifecycle pricing.

Therefore, the Court finds that this element of a single-brand aftermarket has not been adequately pleaded.

(3)    Principles of Cross-Elasticity of Demand

As is the case with the second *Epic Games* factor, Plaintiff does not sufficiently plead the fourth factor. Indeed, both the SAC and Plaintiff's response to Defendant's motion are silent on the issue of whether general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market. Therefore, the Court finds that this element of a single-brand aftermarket has not been adequately pleaded.

---

[2] The Ninth Circuit has framed this issue as, in part, a question of whether a customer had knowledge that its initial foremarket purchase would result in "a knowing choice to restrict [its] aftermarket options." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008). An unknowing choice would tend to indicate the difficulty of accurate lifecycle pricing.

\*    \*    \*

Having considered the four *Epic Games* factors regarding establishment of a single-brand aftermarket, the Court finds that Plaintiff has not sufficiently pleaded the existence of the relevant market of low-latency network optimization on AWS. Plaintiff's federal antitrust claims regarding this relevant market—i.e., Counts Two and Three—must be dismissed. Consequently, Plaintiff's state antitrust claims regarding this relevant market—i.e., Counts Four and Five— must also be dismissed. *See* Dkt. No. 55 at 26 (finding that Plaintiff's state antitrust claims necessarily failed, because federal antitrust claims failed).

\*    \*    \*

### 2.    Count One: Attempted Monopolization of Cloud Computing Market

Having addressed the threshold matter of defining the relevant market, the Court now turns to the sole surviving antitrust claim: attempted monopolization of the cloud computing market.

Count One of the SAC is Attempted Monopolization of the Cloud Computing Market, a claim brought under Section 2 of the Sherman Act. "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (alteration in original) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "Monopoly power is 'the power to control prices or exclude competition.'" *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1022 (N.D. Cal. 2016) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). "'[T]o determine whether there is a dangerous probability of monopolization,' courts 'consider the relevant market and the defendant's ability

1  to lessen or destroy competition in that market.'" *Id.* (alteration in original) (quoting *Spectrum*

2  *Sports*, 506 U.S. at 456).

3       In dismissing this claim as pleaded in the FAC (where it had been pleaded as Count

4  Two)—the Court found that Plaintiff had not sufficiently alleged the first element of attempted

5  monopolization—predatory or anticompetitive conduct. The Court concluded that under

6  Plaintiff's refusal-to-deal theory (a form of anticompetitive conduct), Plaintiff had not plausibly

7  alleged that "the only conceivable rationale or purpose [for Defendant's actions] is to sacrifice

8  short-term benefits in order to obtain higher profits in the long run from the exclusion of

9  competition." Dkt. No. 55 at 19 (quoting *Qualcomm*, 969 F.3d at 993–94). The Court also found

10 that Plaintiff had not adequately pleaded the third element of attempted monopolization—that

11 there was "a 'dangerous probability' that Defendant will achieve monopoly power in the cloud

12 computing market" (Dkt. No. 55 at 13).[3] The Court now considers whether Plaintiff has

13 remedied these defects as to the first and third elements and, further, examines the sufficiency of

14 Plaintiff's pleading of the second element.

15      As discussed below, although Plaintiff has adequately pleaded the first element—

16 predatory or anticompetitive conduct—it has not sufficiently pleaded the second (specific intent)

17 and third (dangerous probability) elements.

18                    a.    ***Predatory or Anticompetitive Conduct***

19      Plaintiff alleges predatory or anticompetitive conduct on a "refusal to deal" theory, which

20 the Supreme Court described in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585

21 (1985). "As a general rule, businesses are free to choose the parties with whom they will deal, as

22 well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine*

23

24 ---
[3] The Court's prior Order did not discuss whether Plaintiff had sufficiently pleaded the second element of attempted monopolization, regarding Defendant's specific attempt to monopolize.

1    *Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). But in *Aspen Skiing*, the Supreme Court developed

2    "[t]he one, limited exception to this general rule." *Qualcomm*, 969 F.3d at 993 (citing *Aspen*

3    *Skiing*, 472 U.S. 585). Under a "refusal to deal" theory,

4    > a company engages in prohibited, anticompetitive conduct when
5    > (1) it unilaterally terminates a voluntary and profitable course of
     > dealing; (2) the only conceivable rationale or purpose is to sacrifice
     > short-term benefits in order to obtain higher profits in the long run
6    > from the exclusion of competition; and (3) the refusal to deal
     > involves products that the defendant already sells in the existing
7    > market to other similarly situated customers.

8    *Id.* at 993–94 (citation modified). In its prior Order, the Court found that Plaintiff had

9    satisfactorily alleged the first and third elements of a refusal-to-deal claim (*see* Dkt. No. 55 at

10   16–18, 20), but not the second element (*see id.* at 19). The Court thus examines Plaintiff's re-

11   pleaded allegations regarding the "only conceivable rationale" element.

12       In its prior Order, the Court found that Plaintiff had not "allege[d] that the only

13   conceivable rationale or purpose" behind Defendant's conduct was "to sacrifice short-term

14   benefits in order to obtain higher profits in the long run from the exclusion of competition." Dkt.

15   No. 55 at 19 (quoting *Qualcomm*, 969 F.3d at 993). The Court cited arguments that Plaintiff had

16   made at oral argument but had not pleaded in its FAC and advised that, "While these allegations

17   are simply not in the [FAC], they might be added along with other allegations to support his

18   element of the claim." *Id.*

19       Plaintiff has added some 10 new paragraphs regarding Defendant's rationale or purpose

20   behind its conduct. *See* Dkt. No. 57 ¶¶ 181–190 The gist of the new allegations in the SAC is

21   that Defendant's conduct worsened the service that Plaintiff could provide to its client, Epic

22   Games. *See id.* ¶ 186. This, in turn, degraded the product—i.e., the gaming experience—for

23   Epic's customers, leading to unrealized growth for Epic. *See id.* ¶¶ 183, 186. Plaintiff argues

24   that, because that potential growth would have led to Epic's increased usage of Defendant's

network, thus resulting in "many more millions in revenue [for Defendant] from Epic's Fortnite game," Defendant's taking steps to throttle that growth represented its sacrificing revenue "for the longer-term purpose of excluding a rival network optimization service . . . ." *Id.* ¶ 189. Defendant argues that Plaintiff's cause-and-effect presentation is attenuated and unrealistic, because it "depend[s] on implausible speculation to show *any* profit sacrifice, much less a sacrifice that is direct and short-term." Dkt. No. 59 at 16.

The Court is not so sure. First, Defendant's presumption that profit sacrifice must be "direct" is unwarranted. Contrary to Defendant's assertion (*see* Dkt. No. 59 at 16), the Court does not conclude that *Aspen Skiing* and its primary successor cases in the Ninth Circuit[4] impose a requirement that a plaintiff establish "direct" sacrifice. Defendant points to a district court's dismissal of a complaint where the plaintiff's "theory of short-term sacrifice [was] far from obvious or even intuitive." *Id.* at 17 (quoting *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1151 (N.D. Cal 2020)). But "obvious" and "intuitive" do not necessarily mean "direct." And *hiQ Labs* is distinguishable from the case before the Court. Plaintiff's theory here is, if not "obvious," easily comprehensible. The cause-and-effect that Plaintiff describes here is, in reality, quite intuitive, the chain of events easy to follow. *See* Dkt. No. 57 ¶¶ 181–190. Plaintiff alleges that "[t]he longer gamers play Fortnite, and the more gamers who join the game, the more revenue AWS earns." *Id.* ¶ 187. Plaintiff alleges further that Defendant's actions kneecapped "a 20–30% increase in Fortnite player engagement," which translated to Defendant's "sacrific[ing] 20–30% additional computing time revenues that it would have realized." *Id.* ¶¶ 183, 186. Put another way, more engagement would have meant more revenue for Defendant, and in refusing

---

[4] *E.g.*, *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016); *Qualcomm Inc.*, 969 F.3d 974.

1   to peer, Defendant eschewed that increased engagement—and sacrificed the increased revenue.

2   This is straightforward; no leap of logic is needed to make sense of Plaintiff's allegations.

3        As to Defendant's use of *Tyntec Inc. v. Syniverse Technologies, LLC*, No. C17-591, 2020

4   WL 2786873 (M.D. Fla. May 29, 2020), this case is also distinguishable. First, *Tyntech* is a

5   summary-judgment case, and the court there clearly had a robust evidentiary record before it. *See*

6   *generally id.* Second, *Tyntec* necessarily applied Eleventh Circuit precedent, which "constricts

7   the boundary of 'refusal to deal' liability and narrows the conduct that falls within the boundary"

8   further than the Supreme Court's original conception of the theory in *Aspen Skiing*. *Id.* at *2

9   (citing *Morris Commc'ns v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) and *Covad*

10  *Commc'ns v. Bell South Corp.*, 374 F.3d 1044 (11th Cir. 2004)). It is unclear whether such

11  constriction and narrowing would be applicable in this case, which is governed by Ninth Circuit

12  precedent. *See Qualcomm*, 969 F.3d at 993.

13       Second, the Court is not aware of any widely accepted or generally applied definition of

14  "short-term," particularly within the realm of refusal-to-deal antitrust law. Nor does Defendant

15  provide one. Whether, in a refusal-to-deal context, "short-term" maintains an *absolute*

16  meaning—that is, tomorrow, or next week, or next quarter—or a *relative* meaning—that is,

17  merely occurring sooner than something else—is not authoritatively demonstrated by Defendant.

18  Indeed, Defendant does not provide any applicable authority that requires that the Court utilize

19  its chosen absolutist framework. Indeed, in a different branch of antitrust, predatory pricing—

20  where short-term versus long-term is a very relevant distinction—the Ninth Circuit advised that

21  courts "eschew dogmatic adherence to a particular, rigid test and . . . [instead] fashion broad and

22  flexible objective standards concerned with accurately evaluating the purposes of business

23  behavior." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014,

24  1031 n.18 (9th Cir. 1981). The Court thus rejects the notion that there is only one narrow

1   conception of "short-term." Consequently, in the ever-evolving world of online gaming, the

2   Court is unwilling, especially at this early procedural posture, to adjudicate the sacrifice

3   described in the SAC as insufficiently short-term as a matter of law. Defendant characterizes

4   Plaintiff's theory as "requir[ing] waiting some period of time for gamers to begin noticing

5   differences in latency, deciding as a result that they will spend more of their leisure time doing

6   something other than playing Fortnite, and thereby decreasing AWS's cloud computing

7   revenues." Dkt. No. 59 at 18. Yet as anyone who has ever been burdened by a slow internet

8   connection, even temporarily, can attest, in 2025, "some period of time" can be a matter of

9   seconds while a streaming video buffers or a download stalls. Plaintiff alleges that "[f]or multi-

10  player video games such as Fortnite there is a direct correlation between lower latency and

11  increase[d] player engagement" (Dkt. No. 57 ¶ 182), which the Court accepts as true on a motion

12  to dismiss. *See DaVinci Aircraft*, 926 F.3d at 1122.

13          And given the relationship, as alleged, between engagement, "compute time expended by

14  AWS servers," and Defendant's revenue (*see* Dkt. No. 57 ¶¶ 184–186) the decision to "do[]

15  something other than play[] Fortnite" (Dkt. No. 59 at 18) would have an instantaneous effect as

16  players opt to play a different game, grab a book, or pick up a soccer ball. Both Parties'

17  arguments on this subject matter are necessarily fact-specific, and given the plausibility of

18  Plaintiff's position, the Court cannot conclude that Defendant's is more meritorious at this

19  procedural posture.

20          Third, Defendant misstates the allegations in the SAC. Defendant argues, "Based

21  on . . . data limited to the Middle East, Subspace presumes that it 'would have enabled a 20–30%

22  increase in Fortnite player engagement elsewhere in the world,' which would have led Epic to

23  increase its use of AWS's cloud, which in turn would have led to additional profits for AWS."

24  Dkt. No. 59 at 16. But this is not what Plaintiff has alleged. Rather, Plaintiff alleges that "*based*

*on world-wide network telemetry data* collected by Subspace, Subspace would have enabled a 20–30% increase in Fortnite player engagement elsewhere in the world." Dkt. No. 57 ¶ 183 (emphasis added). Defendant has apparently translated "world-wide telemetry data" to mean "data limited to the Middle East," then based its argument on that mistranslation. Equating "world-wide" with "limited to the Middle East" is unreasonable, and Defendant's decision to interpret Plaintiff's allegation so differently from its literal meaning leaves the Court unpersuaded.

Fourth, where the Court found in its prior order that "it would seem Defendant stood to gain from Plaintiff as a paid customer rather than a free peering partner" (Dkt. No. 55 at 19), the Court now finds that Plaintiff's additional allegations effectively counter that supposition. Plaintiff alleges that "[f]orcing Subspace to use AWS's ineffective DX product instead of peering would have been much less profitable for AWS, even though AWS could charge for the service." Dkt. No. 57 ¶ 190. "AWS's charges for DX were on the order of thousands per month but the lost revenue to AWS was on the order of millions per month. DX could never have enabled the enormous increase in player engagement Subspace demonstrated in the Middle East and was ready to replicate worldwide." *Id.* As Plaintiff has presented its case, Defendant's DX profits are a red herring; they are not part of the short-term/long-term structure on which Plaintiff has predicated its refusal-to-deal argument. That is to say, DX, and the small profits Defendant claims it would have reaped from it, are irrelevant. Rather, the *short-term sacrifice* as pleaded by Plaintiff is the *increased revenue from increased engagement*; the long-term objective—and the crux of the antitrust complaint—is to knock a competitor out of the marketplace, then claim that competitor's business. In focusing on "the *increase* in AWS's revenue from the collecting the price of DX for the connection" (Dkt. No. 59 at 17), Defendant misconstrues Plaintiff's case. The issue is Defendant's refusal to peer, not its offer to sell Plaintiff DX.

1    Therefore, the Court finds that Plaintiff has sufficiently pleaded that the only conceivable

2    rationale for Defendant's actions was the short-term sacrifice of profits for long-term gain.

3        b.    *Specific Intent to Monopolize*

4        While Plaintiff alleges that Defendant "acted with specific intent to monopolize and harm

5    competition in the market for low latency network optimization services within the AWS

6    Network" (Dkt. No. 57 ¶ 226) Plaintiff makes no such allegation as part of its claim that

7    Defendant attempted to monopolize the cloud-computing market. As discussed above, *see supra*

8    Section III.B.1, Plaintiff's claims regarding low-latency network optimization services fail

9    because Plaintiff has not adequately pleaded the existence of the relevant market. With respect to

10   the cloud-computing market, Plaintiff successfully defines the relevant market. But Plaintiff

11   pleads only a *general* intent to monopolize, which is not sufficient to satisfy the specific-intent

12   element of an *attempted*-monopolization claim.[5] *See Cal. Computer Prods., Inc. v. Int'l Bus.*

13   *Machines Corp.*, 613 F.2d 727, 736 (9th Cir. 1979) (distinguishing between the "general intent"

14   required to prevail in a claim of "completed offense" of monopolization and the "specific intent"

15   required to prevail in a claim of "mere attempt") (citing *Times-Picayune Publ'g Co. v. United*

16   *States*, 345 U.S. 594, 626 (1953)); Dkt. No. 55 ¶ 213 ("AWS intends to dominate the market for

17   cloud computing services to maintain its enormous profits."). Therefore, Plaintiff has not

18   adequately pleaded the specific-intent element of an attempted-monopolization claim.

19

20

21   [5] In pleading Count Five, Plaintiff's state-law claim for attempted monopolization of the market for low-latency optimization services within the AWS network, Plaintiff alleges that "AWS acted with the specific intent to monopolize and harm competition in the market for game cloud computing network optimization services within the AWS Network." Dkt. No. 57 ¶ 241. Although Plaintiff uses the words "specific intent" and "cloud computing," the context of the allegation makes clear that Plaintiff makes this allegation in reference to a claim pertaining to the "low latency network optimization services on AWS" aftermarket, not the cloud-computing market. As discussed above, *see supra* Section III.B.1, Plaintiff has not adequately pleaded the existence of the "low latency network optimization services on AWS" aftermarket, and claims associated with that market—including Count Five—have been dismissed.

1

   c.  ***Dangerous Probability***

2

   Plaintiff has augmented its allegations that there is a 'dangerous probability' that

3 Defendant will achieve monopoly power in the market for cloud computing by adding six new

4 paragraphs to the SAC. *See* Dkt. No. 57 ¶¶ 101–106. Plaintiff now alleges that "[t]here are

5 enormous barriers to entry into the cloud computing market." *Id.* ¶ 101. Rivals "such as

6 Microsoft and Google are also unable to discipline AWS's dominance." *Id.* ¶ 102. "AWS's

7 dominance in the market for cloud computing and the market for low latency network

8 optimization services on AWS is also due to the inability of AWS cloud customers to change to

9 another cloud provider once they are enmeshed in the AWS cloud and its services." *Id.* ¶ 103.

10 "AWS . . . has the most computing power, the most connections, and the most network

11 facilities." *Id.* ¶ 104. "AWS's dominance is further enhanced by its many ancillary services it

12 provides to cloud customers." *Id.* ¶ 105. And "once a company has been thoroughly enmeshed in

13 the AWS cloud, it cannot change cloud providers without incurring enormous costs and the

14 threat of a difficult transition, even if AWS changes the terms of its service by denying peering

15 to a company such as Subspace." *Id.* ¶ 106.

16

   Defendant argues that these allegations are "entirely conclusory and should therefore be

17 disregarded." Dkt. No. 59 at 23. But taken in their entirety, Plaintiff's new allegations are not

18 conclusory at all and, at this procedural posture, the Court accepts them as true. *See DaVinci*

19 *Aircraft*, 926 F.3d at 1122. The allegations from Paragraphs 101 through 106 are not merely

20 "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

21 statements[.]" *Iqbal*, 556 U.S. at 678. Plaintiff alleges, among other things: "AWS's first-mover

22 advantage" (Dkt. No. 57 ¶ 101); AWS's 30% profit margins, which "enabl[e] it to continue to

23 outspend any other cloud service provider" (*id.* ¶ 102); how "Epic Games cannot move its

24 servers from AWS to another cloud provider without disrupt[ion]" (*id.* ¶ 104) or "incurring

enormous costs and the threat of a difficult transition" (*id.* ¶ 106) and; how AWS's "ancillary services . . . make it extremely difficult, if not impossible, for a customer to exit the AWS cloud" (*id.* ¶ 105). For its part, Defendant merely cherry-picks the topic sentences from the SAC's new paragraphs, ignores the substantiating material that follows, then calls the whole thing "conclusory." *See* Dkt. No. 59 at 24. Defendant may very well be able to successfully deconstruct Plaintiff's factual premises at summary judgment or at trial, but such argument is misplaced in a motion to dismiss. *See High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (noting that "[t]he process of defining the relevant market is a factual inquiry for the jury").

Still, although these new allegations are well-pleaded, they are not, even when taken in the aggregate, sufficiently robust to survive Defendant's challenge here. In its prior Order, the Court found that although Plaintiff had alleged that Defendant "already has at least a 40% market share for cloud computing and has a dangerous probability of gaining a 60–70% market share in the near future," Plaintiff had not adequately alleged additional conditions that the Ninth Circuit has held must be present to find that that level of "market share was sufficient as a matter of law to support a finding of market power for attempted monopolization." Dkt. No. 55 at 14; *see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Specifically, "the Ninth Circuit [has] held that a 44-percent market share was sufficient 'if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing.'" Dkt. No. 55 at 14 (quoting *Rebel Oil*, 51 F.3d at 1438).

"Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale." *Image Tech. Servs.*, 125 F.3d at 1208 (citing *Rebel Oil*, 51 F.3d at 1439). Plaintiff alleges in the SAC that "There are enormous barriers to entry in the cloud computing market. A new

1    entrant today would have to invest hundreds of billions of dollars to compete with AWS, with no

2    guarantee of success. AWS's first-mover advantage and well-established dominance are

3    additional high barriers to entry." Dkt. No. 57 ¶ 101. This is a thin allegation that borders on

4    conclusory. But adjacent to conclusory is not conclusory. The inclusion of a price tag here—i.e,

5    "hundreds of billions of dollars"—renders the allegation a factual statement, and thus well-

6    pleaded, albeit barely so.

7         As to expanding output in response to supracompetitive pricing, the SAC alleges that

8    "AWS's rival cloud providers such as Microsoft and Google are also unable to discipline AWS's

9    dominance." Dkt. No. 57 ¶ 21. In support of this allegation, Plaintiff alleges that "AWS has more

10   data centers located around the world than any other cloud service provider, and has more

11   customers and revenues." *Id.* But "more data centers" and "more customers and revenues" do not

12   equate to an inability to expand output in response to supracompetitive pricing. And the Court is

13   unsure what Plaintiff means by alleging competitors' inability to "discipline AWS's dominance."

14   The SAC is silent on whether Defendant engages in supracompetitive pricing in the cloud

15   computing market, and it does not allege anything about whether competitors may or may not be

16   able to respond.

17        Referring to high entry barriers and ability to expand output in response to

18   supracompetitive pricing, the Court advised in its prior Order that "Plaintiff does not allege these

19   market conditions," but "may amend its claim to address these factors." Dkt. No. 55 at 14. In the

20   SAC, Plaintiff has alleged the former, but not the latter. Therefore, Plaintiff still has not

21   sufficiently alleged "dangerous probability" of Defendant's achieving monopoly power.

22                                    *       *       *

23        Therefore, Plaintiff has not adequately pleaded its claim of attempted monopolization of

24   the cloud computing market. Accordingly, Count One must be dismissed.

C.    **Count Six: Tortious Interference**

In dismissing the FAC, the Court found that Plaintiff had not sufficiently alleged the fourth element of a state-law claim of tortious interference. *See* Dkt. No. 55 at 31–32. The Court, however, did not analyze the other four elements of such a claim. *See id.* Plaintiff has substantially reformulated this claim in the SAC, and the Court will examine the amended claim (Count Six of the SAC) in full.

In Washington, a claim of tortious interference requires five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Moore v. Com. Aircraft Interiors, LLC*, 168 Wn. App. 502, 508–09, 278 P.3d 197 (2012) (quoting *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997)). Although "the 'improper means' prong of the fourth element requires a violation of a 'statute, regulation, common law rule, or professional standard,' the 'improper purpose' prong bears no such requirement." *United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1099 (W.D. Wash. 2022) (citing *Pleas v. City of Seattle*, 112 Wn.2d 794, 774 P.2d 1158 (1989)). Improper purpose can include "acting out of ill will, greed, retaliation, or hostility," or being "motivated by an intent to harm the plaintiff." *Moore*, 168 Wn. App. at 509.

1.    **Elements 1, 2, 3, and 5**

It is clear that Plaintiff has adequately pleaded the first, second, third, and fifth elements of the tort. First, Plaintiff alleges that "Subspace and Epic Games entered into a valid contractual relationship pursuant to which Subspace provided network optimization services to Epic Games to eliminate or reduce latency and tromboning in the Middle East, thereby giving Epic Games'

Fortnite users an optimal gaming experience." Dkt. No. 57 ¶ 248. Second, Plaintiff alleges that

Defendant "was aware of this relationship between Subspace and Epic for latency optimization

services no later than June 20, 2019." *Id.* ¶ 247; *see also id.* ¶¶ 254–255 (alleging existence of a

second contract between Plaintiff and Epic and Defendant's knowledge thereof).

As to the third element, Plaintiff alleges that:

> Defendant intentionally caused Subspace to be unable to perform
> under its contract with Epic Games by initially peering with
> Subspace in the Middle East and initially agreeing to expand
> peering to other regions, which caused Subspace to rely on AWS's
> written policies and other assurances that it would provide such
> connectivity, but then refusing to follow through with its
> assurances, and demanding to shut down all peering.

*Id.* ¶ 257. Such alleged "interference occurred both before and after the actual execution of the

worldwide contract between Epic and Subspace in June 2020." *Id.* ¶ 260. Plaintiff alleges further

that:

> AWS intentionally interfered with the Subspace-Epic Games
> business expectancy and contract by its refusal to peer with
> Subspace materially impeded [*sic*] Subspace's ability to perform
> under its contract. AWS gave Subspace no viable option that
> would enable Subspace to continue to provide network
> optimization service to Epic Games.

*Id.* ¶ 262. Plaintiff alleges that Defendant interfered with its relationship with Epic, "even though

such peering would benefit AWS's and Subspace's mutual customer, Epic Games." *Id.* ¶ 261.

As to the fifth element, Plaintiff alleges that, as a result of Defendant's conduct,

Plaintiff's "business model became unviable, and its contracts with customers were interfered

with to the point of forcing cancellation." *Id.* ¶ 62. Plaintiff alleges that it "was forced out of the

market in May 2022." *Id.* ¶ 63. Such allegations sufficiently plead this element of a tortious-

interference claim. *See Kische USA, LLC v. Simsek*, No. C16-168, 2016 WL 6273261, at *10

(W.D. Wash. June 29, 2016) (finding element had been adequately pleaded where plaintiff

"plausibly pleaded . . . loss of its business relationships with suppliers and major retail clients,"

because "[a]t this stage of proceedings, the court c[ould] reasonably infer that [plaintiff had]

sustained damages from the alleged interference"); *accord United Fed'n of Churches*, 598 F.

Supp. 3d at 1099.

### 2.    Element 4

Plaintiff has adequately pleaded "improper purpose" in satisfaction of the fourth element.

Defendant's arguments in opposition are unpersuasive. First, Defendant's temporal argument—

that Plaintiff "entered into a global agreement with Epic on June 18, 2020," three months after

Defendant's "first purported refusal to expand the parties' peering relationship" (Dkt. No. 59 at

29–30)—ignores the allegations that "[a]s early as March 2019, Subspace and Epic began

discussing a business relationship," and that Defendant was aware of this relationship "no later

than June 20, 2019" (Dkt. No. 57 ¶¶ 246–247). Moreover, a contract is not an essential part of a

valid business expectancy, which "includes any *prospective contractual or business relationship*

that would be of pecuniary value." *Newton Ins. Agency & Brokerage v. Caledonian Ins. Grp.*,

114 Wn. App. 151, 158, 52 P.3d 30 (2002) (emphasis added). Defendant cannot defeat these

allegations by merely pointing to a calendar.

Second, Defendant confuses improper means with improper purpose by overextending

the proposition that acting within one's rights, or "exercising one's legal interest," cannot form

the basis of a claim for tortious interference. Dkt. No. 59 at 29 (quoting *Cornell v. Soundgarden*,

No. C20-1218, 2021 WL 3563083, at *7 (W.D. Wash. July 15, 2021)). Acting and exercising are

means, not purposes. Means are how one does something; purposes are why one does it. The

*complete* principle, as explained in *Cornell*, is that "[w]hile 'exercising one's legal interest in

good faith is not improper interference,' when a party acts *with greed, hostility, or retaliation,*

they demonstrate an improper purpose." 2021 WL 3563083, at *7 (emphasis added) (quoting

1    *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 168, 273 P.3d 965 (2012)). Plaintiff's

2    claim is predicated on Defendant's motives, not its means.

3            Finally, Defendant attempts to brush off Plaintiff's allegations by arguing that,

4    "Ultimately, Subspace took a gamble by basing its entire business model on a relationship that it

5    knew up front was never guaranteed. That Subspace's strategy did not succeed did not transform

6    AWS's lawful conduct into a tort." Dkt. No. 59 at 30. This is unavailing. Virtually all business

7    relationships are predicated on a "gamble" that one's counterparties will conduct themselves

8    with fairness and in good faith. *See, e.g.*, *Rekhter v. State, Dep't of Soc. & Health Servs.*, 180

9    Wn.2d 102, 111–12, 323 P.3d 1036 (2014) (discussing duty of good faith and fair dealing and

10   collecting cases). At this early stage in the litigation, Defendant cannot ignore Plaintiff's factual

11   allegations that Defendant acted unfairly.

12           Plaintiff alleges that Defendant "retaliated against Subspace because of AWS's

13   frustration and fear that Subspace would enable Epic to easily migrate Fortnite servers from

14   AWS to other competing cloud compute [*sic*] providers such as Google Cloud." Dkt. No. 57

15   ¶ 258. Plaintiff asserts that it "shamed" Defendant (Dkt. No. 60 at 27) and "impaired AWS's

16   negotiating leverage with Epic Games" (Dkt. No. 57 ¶ 252), and that Defendant subsequently

17   "retaliated" out of "frustration," "fear," and pique. *Id.* ¶ 258. Certainly, Plaintiff will eventually

18   need to present evidence to substantiate its assertions. But at the pleading stage, these allegations

19   are sufficient to survive a motion to dismiss.

20   **D.    Leave to Amend**

21           The Court dismisses Counts One, Two, Three, Four, and Five of the SAC. "Normally,

22   when a viable case may be pled, a district court should freely grant leave to amend." *Cafasso,*

23   *U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citing *Lipton v.*

24   *Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)). "[A] party is not entitled to an

opportunity to amend his complaint if any potential amendment would be futile." *Mirmehdi v. United States*, 689 F.3d 975, 985 (9th Cir. 2012). Further, "the district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Cafasso*, 637 F.3d at 1058 (quoting *Ascon Props., Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1160 (9th Cir. 1989)). As discussed above, the SAC's infirmities stem primarily from the omission of required elements and necessary facts. That is, the Court cannot definitively hold that Plaintiff's antitrust claims are futile. Therefore, the Court will dismiss Counts One through Five with leave to amend. However, if Plaintiff fails to adequately plead these causes of action in a third amended complaint, these claims will be dismissed with prejudice.

### IV.    CONCLUSION

Accordingly, Defendant's motion to dismiss (Dkt. No. 59) is GRANTED IN PART and DENIED IN PART. It is hereby ORDERED:

(1)    Counts One, Two, Three, Four, and Five are DISMISSED WITHOUT PREJUDICE.

(2)    Should Plaintiff opt to amend these claims, Plaintiff SHALL file a third amended complaint **no later than January 21, 2026.**

Dated this 22nd day of December 2025.

Tana Lin
United States District Judge